10-3288-cv
Fabrikant v. French

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2011

(Argued: May 16, 2012      Decided: August 16, 2012)

Docket No. 10-3288-cv

————————

JODY FABRIKANT,

*Plaintiff-Appellant*,

RUSSELL A. SCHINDLER,

*Plaintiff*,

— v. —

CHRISTINE FRENCH, WILLIAM DERIDDER, HECTOR L. MEJIAS, JR., JOHN SPINATO,
CATHERINE PALMER-WEMP, WALTER SASSE, CHRISTINA KHULY, DAVID STARK,
DIANE STARK, ULSTER COUNTY SOCIETY FOR THE PREVENTION OF
CRUELTY TO ANIMALS, BRADLEY KNEE, AVERY SMITH, LARAINE CALIRI,

*Defendants-Appellees*,

THOMAS NACE,

*Defendant.*

————————

B e f o r e:

NEWMAN, STRAUB, and LYNCH, *Circuit Judges*.

————————

Appeal from a grant of summary judgment for defendants on plaintiff-appellant Jody Fabrikant's federal constitutional claims, which arose from a search of her property, her arrest on animal abuse charges, and the seizure, spaying and neutering, and fostering of her dogs during the pendency of state criminal proceedings. We conclude that (1) defendants acted under color of state law when they sterilized Fabrikant's dogs and fostered them out to temporary homes following the animals' seizure; (2) defendants are nevertheless entitled to qualified immunity on Fabrikant's due process claims, as their actions did not violate any "clearly established" constitutional or statutory right; and (3) defendants involved in the search and arrest are entitled to summary judgment on Fabrikant's malicious prosecution, unreasonable search and seizure, and First Amendment retaliation claims because their actions were supported by probable cause. We therefore affirm the district court's judgment.

AFFIRMED.

———————

MATTHEW MICHAEL (Andrew Beyer, Baruch Weiss, *on the brief*), Arnold & Porter LLP, Washington, DC, *for Plaintiff-Appellant*.

SUE H. R. ADLER (Dean S. Sommer, *on the brief*), Young Sommer Ward Ritzenberg Baker & Moore LLC, Albany, New York, *for Defendants-Appellees*.

———————

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellant Jody Fabrikant appeals from a decision of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*) granting summary judgment for defendants and dismissing her federal constitutional and pendent state-law claims. Because we conclude that defendants are entitled to judgment as a matter of law on all the claims that Fabrikant presses on appeal, we affirm the grant of summary judgment, although our reasons differ in several respects from those articulated by the district court.

**BACKGROUND**

I.      The SPCA Investigation and State Criminal Proceedings

The material facts of this case are not in dispute.[1]

Jody Fabrikant is a pet owner in upstate New York. Beginning in the early 1990s, she started taking in dogs to save them from euthanasia, medical ailments, or abandonment. In 2001, she moved to a rental property in Ulster County, New York, that provided more space for her four dogs. She soon adopted a fifth dog.

---

[1] Fabrikant has admitted or failed to contest most of these facts. Other facts, where noted, are drawn from the statements of witnesses who visited Fabrikant's home in 2002. Fabrikant disputes the accuracy of some of those witnesses' assertions. For purposes of this appeal, however, the relevant question is not whether the witnesses' statements were accurate, but whether a peace officer reviewing those statements – which plaintiff does not dispute were in fact made – could reasonably have believed that they established probable cause to apply for a search warrant of Fabrikant's house. As explained later in this opinion, the witnesses' statements clearly met that standard.

3

On the property was a barn that the landlord rented to a woman named Camille Fraracci, who used it to hold various animals, including an ox, a cow, calf, and sheep, as well as approximately thirty dogs "running around loose." In the spring of 2001, defendant-appellee John Spinato, an investigator for defendant-appellee the Ulster County Society for the Prevention of Cruelty to Animals ("SPCA"), made several visits to the property and asked Fabrikant for her help in an ongoing investigation of Fraracci, and to gain entrance into the barn to inspect Fraracci's animals. At the time, Spinato observed that Fabrikant's pets were in "decent condition."

One of Fraracci's dogs impregnated one of Fabrikant's dogs, which gave birth to a litter of nine puppies in the summer of 2001. Fabrikant made some efforts to find adoptive homes for the puppies, by placing advertisements in newspapers and on bulletin boards and by making calls to rescue agencies, including the SPCA. None of her attempts to find adoptive homes for the puppies succeeded.

Fraracci eventually learned of the SPCA's ongoing investigation into her treatment of her animals. According to Fabrikant, Fraracci threatened to harm her and her pets if Fabrikant continued to assist the SPCA. Out of fear of Fraracci, and because of "the way Mr. Spinato carried out his investigation," Fabrikant told Spinato that she would not participate further as a witness in the SPCA's investigation of Fraracci. Spinato became "pissed off," "sarcastic," and "rude." The SPCA eventually dropped its investigation of Fraracci.

4

In January 2002, Fabrikant and her pets moved to a new rental property away from Fraracci. The house and land provided more space for Fabrikant's dogs. Fabrikant continued to seek adoptive homes for the nine puppies. She also placed an advertisement seeking a dog walker to help her walk the dogs. A young woman named Allison Klock responded to the ad, visited Fabrikant's house, and took one of the dogs for a walk. When Klock visited the house, she observed that the puppies' snouts were taped shut, and she began to cry when she saw the dogs' living conditions. Klock told her mother that the dogs were being neglected. Her mother, in turn, called the New York State Police and the SPCA to report that the dogs were being abused.[2]

By this point, Fabrikant was living with fifteen dogs and a cat. She became overwhelmed trying to care for the animals, staying up "around the clock" to look after them and getting only "one or two hours of sleep a night." She kept the nine puppies on an enclosed porch attached to the house. Because it was winter, she hired a man to help her insulate the porch using "cardboard, wood, plastic and newspaper." Those materials covered the porch's windows. Fabrikant heated the porch with three or four portable space heaters. In an effort to keep the puppies from barking, Fabrikant admits that she occasionally wrapped masking tape around their snouts – the same tape used to "insulate" the porch. The dogs defecated on newspapers inside the house; Fabrikant kept garbage bags filled with the dogs' feces on the enclosed porch. Fabrikant continued to place ads

---

[2] Although Fabrikant contends Klock is lying, she does not dispute that Klock's allegations were reported to the authorities.

and post flyers in search of adoptive homes for the puppies. Several interested persons responded and offered to adopt the dogs, but Fabrikant ultimately refused each offer, or imposed deal-breaking conditions on the adoptions – for example, requiring that before prospective adopters could take the dogs, they sign a "contract" providing, inter alia, that Fabrikant would have "full visitation rights" to come onto the adopters' property to visit the dogs whenever she wanted.

Several of the prospective adopters who visited Fabrikant's house alerted the SPCA about the conditions they observed there. Investigators visited Fabrikant's property three times in February 2002 to check on the animals. None of those visits resulted in any charges against Fabrikant. First, a New York State Trooper visited the house to investigate the complaint filed by the mother of Klock, the prospective dog walker. Fabrikant allowed the trooper into the house. The trooper found no "indication of violation of [New York] Agriculture & Markets Law," and later told the SPCA that the animals "appeared in excellent condition."

Second, Spinato, the SPCA investigator, made an unannounced visit to the house. Fabrikant allowed him in and permitted him to examine the animals. Although Spinato and Fabrikant discussed the dogs' overcrowding and Fabrikant's use of twine as collars for the animals, Spinato concluded "that a violation of the Agriculture and Markets Law sufficient enough so as to seize Ms. Fabrikant's fifteen animals was not established at that time." Third, another SPCA investigator, defendant-appellee Walter Sasse, visited Fabrikant's house. Apart from overcrowding, Sasse found "no other real problems present."

Eventually, however, after Spinato and Sasse received additional reports from visitors to Fabrikant's property, Sasse prepared a search warrant application for the house, based on witness statements from Klock and defendants-appellees Christina Khuly, Diane Stark, and David Stark, each of whom had visited Fabrikant's house and observed the conditions of the dogs. In their statements, those witnesses described the scene inside the house and on the enclosed porch. One witness, Diane Stark, described "garbage everywhere and newspapers covering nearly every part of the floor"; puppies being kept six to a pen and three to a cage; at least twenty-five "[H]efty bags filled with dog feces"; dogs with "ropes/twine around their necks"; two dogs with mange, one described as "sickly"; a dog "chewing at an infection on its front foot"; conditions inside the house that "were the worst I have ever seen in my life – filth and a definite fire hazard"; and "no drinking water for the animals." In addition, according to this witness, Fabrikant complained that "she was 'dreadfully overwhelmed' and not able to properly care for the dogs," and Fabrikant refused to take one sick dog to the veterinarian even though Fabrikant told her the dog's infected foot was "starting to smell."

Other witness statements described a similar scene. Klock reported seeing a two-by-two-foot cage with "four puppies in it"; a dog that "wouldn't stand up" but "only crawled across the floor"; another dog that "had its mouth taped shut until I started crying so [Fabrikant] took it off"; and a dog with "twine on the neck . . . choking the dog" – a practice Fabrikant attempted to justify by explaining that she "can't afford collars."

7

Another witness, Khuly, described the enclosed porch attached to Fabrikant's house, where Fabrikant kept nine dogs, as having "an overwhelming smell of feces and urine." Puppies were "crammed into two crates – three dogs to a crate." The dogs had no leashes or collars. One dog, which this witness tried to take for a walk, "stood with its head down and his legs askance not knowing what to do," behavior the witness understood to indicate that the dog "had not only been hit many times but was also not often outside of his crate." Another dog "was so afraid [that] he bit" the hand of the witness's husband. Dogs had twine tied around their necks. Garbage bags filled with feces were "stock piled in a corner," and there was a "mound" of dog food in the kitchen. Five dogs had "tape around their snouts," which, according to the witness, Fabrikant attempted to explain by saying that one dog's barking "left her no other option than to shut him up with tape." One dog's fur was falling out. Fabrikant cried, screamed, and complained that "she needed help and couldn't take this anymore." After cutting tape off a dog's snout, Fabrikant retaped it "really tight," "much tighter than when" the witness "first came over that day." Fabrikant also reportedly told the witness that one of the dogs had come to her in a dream and "had asked [Fabrikant] to let them go." According to this witness, Fabrikant said that in the dream the dog asked her, "'[D]o I have to kill you?'"

Witness David Stark described seeing "food (human food) all over the kitchen. Newspapers with urine and feces all over the floor. The smell was overwhelming." The enclosed porch "had boxes and newspapers taped up and down the walls." The witness observed six puppies in one pen, three in one crate, feces and urine in both containers,

"30-40 plastic bags filled with dirty paper and feces," and "3 electric heaters that were on" and sitting atop soiled newspaper. Fabrikant, according to this witness, complained that "she couldn't take it anymore," and that "the dogs were too much for her to handle." Fabrikant later called this witness to complain that one of her dogs "had a very bad infection that now smelled"; she asked this witness if he "had a muzzle or any tranquilizers." She refused to take the sick dog to a veterinarian. Fabrikant also told this witness that "one of her dogs had worms," but said that "she wanted to find a homeopathic remedy to treat it" rather than go to a veterinarian. Fabrikant, according to this witness, "never has treated the worms."

A state-court judge approved the search warrant application, which gave the SPCA authority to search for and seize Fabrikant's nine puppies, along with the adult Rottweiler and Chow, "and any other evidence of animal cruelty." With the warrant in hand, SPCA peace officers, accompanied by sheriff's officers, visited Fabrikant's property, where they found one of her dogs tied up outside, in the cold, with no food or shelter, and missing some of its fur. The officers knocked on Fabrikant's door, but she did not answer, so they climbed a ladder and entered the house through a back door on an upper floor. The officers handcuffed her, led her outside, and placed her in the back of a patrol car. According to the officers, she attempted to kick out the car's window.

The dogs' conditions generally matched the descriptions provided by witnesses. A veterinarian on site examined the dogs and found that one had a seriously infected wound on its face; another had various skin problems, including dermatitis and folliculitis, as

well as flea infestation; and a third dog had a severe ear infection, ear and periodontal diseases, and flea infestation.[3] In addition, the cat was found to have an ear infection and a distended stomach.[4] According to the officers conducting the search, the house stank of feces and urine, and bags of feces were piled around the enclosed porch, where nine dogs were kept in cages and crates. The officers found two dogs locked in a bathroom where the floor was covered with feces and trash. They also found a cat inside a closet of that bathroom.[5] The officers conducting the search took photographs and made a video of the inside of the house that confirm most of the above-described conditions.[6]

---

[3] The findings of the veterinarian do not precisely match the witnesses' accounts: one dog had an infection on its face, not on a foot; no dog had mange, though one had other skin diseases. The medical examination of the dogs sufficiently corroborated the witnesses' accounts, however, to support the officers' reliance on those accounts.

[4] Fabrikant does not dispute that the animals suffered from these veterinary conditions; she argues merely that they did not rise to the level of animal cruelty, and that some of the dogs already had these medical conditions when she adopted them.

[5] Again, Fabrikant does not dispute these facts. Instead, she attempts to explain, justify, or contextualize them. She argues that she placed the dogs in the bathroom and the cat in the bathroom closet to protect them during the SPCA's raid of the house. Similarly, she contends that the feces on the floor of the bathroom "was most likely the result of the commotion during the home invasion and raid." However, her proffered justifications do not raise a material issue of fact in this case, because while they are relevant to the question of whether Fabrikant actually committed animal cruelty – the question at issue in her state criminal trial – they have no bearing on the question before us: whether defendants had probable cause to *believe* that Fabrikant had committed animal cruelty.

[6] Fabrikant does not dispute these conditions. She disputes only how to characterize that evidence. Whereas defendants argue that because the photos and video showed open garbage bags, piles of feces, and animals locked in small crates, they constitute "evidence of inhumane conditions in which [Fabrikant] held the animals," Fabrikant argues that the photos and video show merely a "messy house," which she argues is no crime. She further contends that the conditions in the house could in fact be "characterized as evidence of a loving home for her animals."

All but two of the dogs were taken away from the house and delivered to the SPCA, where they were fed, cleaned, and treated for various ailments. Meanwhile, Fabrikant was arrested, brought to the sheriff's station in Accord, New York, for processing, and then arraigned before a local court on five counts of criminal animal cruelty, pursuant to New York Agriculture and Markets Law § 353 (criminalizing various forms of animal cruelty and neglect). Four counts alleged that Fabrikant failed to provide veterinary care for three of her adult dogs and her cat. One count alleged that she deprived the nine puppies of water and injured them by taping their snouts. The court released Fabrikant on her own recognizance. The district attorney eventually determined that there was probable cause to prosecute her for animal cruelty. Fabrikant moved to dismiss all charges for lack of probable cause, and made a series of other motions. The court denied all of her motions, and Fabrikant proceeded to trial.

While Fabrikant's criminal proceedings were ongoing, the SPCA, at the direction of the organization's director, defendant-appellee Christine French, spayed or neutered each of the seized dogs. The SPCA then sent the dogs to live in foster homes pending conclusion of the criminal case.

Prior to trial, apparently because of a drafting error in the accusatory instrument, the prosecutor orally moved "in the interest of justice" to dismiss one of the charges against Fabrikant, regarding her treatment of her Rottweiler. The judge granted the motion, over Fabrikant's objection. The trial commenced on the remaining four animal cruelty charges, but ended in a mistrial after Fabrikant's attorney made several prejudicial

11

remarks during his opening statement. At her second trial, a jury acquitted Fabrikant of all remaining charges. It appears that Fabrikant never asked that her seized dogs be returned after the trial.

II.     The Instant Federal Suit

After her acquittal on the state criminal charges, Fabrikant, proceeding pro se, and her co-plaintiff, an attorney,[7] filed a federal civil rights suit pursuant to 42 U.S.C. § 1983 against various persons involved in her state criminal case, including the SPCA, several of its employees, veterinarians and veterinary technicians, and some of the prospective adopters who originally alerted the SPCA about the dogs' conditions. In the complaint, Fabrikant sought hundreds of millions of dollars in compensatory and punitive damages. The complaint included federal claims for malicious prosecution and for violations of her rights to due process, the presumption of innocence, counsel, and freedom from unreasonable searches and seizures. In addition, the complaint included several pendent state-law claims. On appeal, Fabrikant has abandoned her state-law claims.[8]

---

[7] Fabrikant's co-plaintiff on one of the state-law claims in the complaint (libel) was Russell A. Schindler, her attorney for her state criminal case. Schindler represented himself. Fabrikant represented herself in the district court, although, as explained below, she is now represented by court-appointed pro bono counsel. Schindler is not a party to this appeal.

[8] Fabrikant's Notice of Appeal purports to challenge the district court's dismissal of her "numerous claims and case." But in her appellate brief, Fabrikant does not challenge the district court's decision not to exercise supplemental jurisdiction over her pendent state-law claims. Accordingly, she has abandoned those claims. See Universal Church v. Geltzer, 463 F.3d 218, 229 (2d Cir. 2006) ("Generally claims not raised on appeal are deemed abandoned, at least when it is the appellant who fails to do so.").

Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motion, concluding that Fabrikant had failed to plead sufficient facts to establish that any of the defendants were state actors, a requirement for a § 1983 action, and that, even assuming arguendo that the SPCA investigators were state actors, they would be entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Fabrikant v. French, 328 F. Supp. 2d 303, 310-12 (N.D.N.Y. 2004) ("Fabrikant I"). Fabrikant and her co-plaintiff appealed.

III.    First Appeal

On appeal, we vacated the district court's decision and remanded for further proceedings. Schindler v. French, 232 F. App'x 17 (2d Cir. 2007) (summary order). We agreed with the district court that plaintiffs had "failed to sufficiently allege" that the SPCA "was acting under color of state law," as plaintiffs had failed to allege "that the [SPCA] was a state entity, or had otherwise acted under color of state law through some relationship with, or authority vested by, the State." Id. at 19. Accordingly, we found that the district court had "properly granted defendants' motion to dismiss the non-conspiracy claims against [SPCA]." Id. Nevertheless, we vacated and remanded "because it is the usual practice upon granting a motion to dismiss to allow leave to replead," and the district court's decision to deny leave to replead "without any justifying reason" constituted an abuse of discretion. Id. (internal quotation marks and brackets omitted). We remanded to the district court "with instructions to dismiss the non-

13

conspiracy counts against [SPCA] without prejudice and permit plaintiffs an opportunity to replead these claims." Id.

In addition, we concluded that the district court had improperly dismissed plaintiffs' claims against defendants Spinato and Sasse, the SPCA investigators, as those defendants acted as "duly authorized peace officers," and thus were state actors, when they conducted the search of Fabrikant's house and the seizure of the dogs. Id. (internal quotation marks omitted). We further concluded that the district erred by deeming Spinato and Sasse protected from liability by qualified immunity, given that the complaint "alleges that Spinato and Sasse obtained the search warrant in bad faith and knew that the supporting depositions were false and misleading." Id. At the pleading stage, we said, such allegations "preclude dismissal on the basis of qualified immunity." Id.

Finally, we disagreed with the district court's assessment that plaintiffs had "offered only vague and conclusory allegations in support of their conspiracy claims." Id. at 20. On the contrary, we held, the complaint included "detailed allegations that defendants used false deposition testimony and medical reports to improperly obtain a search warrant and pursue false criminal charges against plaintiff Fabrikant and seize her animals," allegations that sufficed to withstand a motion to dismiss. Id. We also vacated the district court's dismissal of plaintiffs' pendent state-law claims "since the sole reason the district court declined to exercise supplemental jurisdiction over these claims was that the federal claims had been dismissed," although we noted that "we question whether plaintiff Schindler's state law claim is properly joined with plaintiff Fabrikant's federal and state law claims." Id.

14

IV.    Proceedings on Remand

On remand to the district court, Fabrikant, proceeding pro se, and her co-plaintiff filed an amended complaint and a second amended complaint.  The district court appointed pro bono counsel for Fabrikant "for purposes of discovery, pretrial motions, and trial only."  Following discovery, defendants moved for summary judgment. Fabrikant withdrew her presumption-of-innocence and right-to-counsel claims, which the district court dismissed.  The court granted summary judgment in defendants' favor on the remaining claims.  Fabrikant v. French, 722 F. Supp. 2d 249 (N.D.N.Y. 2010) ("Fabrikant II").[9]  As to the claims of malicious prosecution, First Amendment retaliation, and unreasonable search and seizure, the court concluded that the summary judgment record – including the videos and photographs taken by the investigators during the raid of Fabrikant's house, the witnesses' accounts of abuse, and Fabrikant's "own admission that she was having difficulty caring for the dogs" – allowed for no conclusion other than that defendants had probable cause "to believe [Fabrikant] had committed animal

―――――――――――――――――

[9] Fabrikant complains that the district court granted summary judgment without first hearing oral argument.  From the district court docket sheet, it is difficult to discern what exactly transpired: the court originally set a motion hearing, then postponed it at defendants' request, and then again at plaintiffs' request.  Apparently oral argument never occurred. Fabrikant makes no effort to explain how the oral argument came to be canceled or how she might have been prejudiced by the district court's decision not to hold oral argument.  "[A] party seeking to reverse a summary judgment order must demonstrate that it was prejudiced by the court's refusal to hear argument."  AD/SAT, A Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 226 (2d Cir. 1999).  At any rate, Fabrikant had the opportunity on appeal to present her arguments, both in writing and orally.  Accordingly, we conclude that she was not prejudiced by the district court's decision to decide the motion on the basis of the record and the parties' motion papers.

cruelty." Id. at 255. As to the due process claim regarding the spaying and neutering of the dogs, the district court concluded that while the SPCA defendants acted under color of state law when they investigated Fabrikant, raided the house, seized the dogs, and arrested her, they did not act under color of state law when they performed surgery on the dogs. The court concluded that Fabrikant had failed to put forward evidence suggesting that this "medical attention . . . was authorized by state law. To the contrary, the defendants performed the medical procedures in furtherance of the [SPCA]'s objectives and under the [SPCA]'s control rather than under some statutory delegation of authority." Id. at 256.

As to the First Amendment retaliation and unreasonable search and seizure claims, the district court found that probable cause existed to defeat those claims. The district court noted as well that the state court in Fabrikant's criminal case had already denied her suppression motion and "determined that the search warrant was supported by probable cause," concluding that Fabrikant was therefore "barred from relitigating this issue while prosecuting her federal constitutional claims under § 1983 in federal court." Id., citing Allen v. McCurry, 449 U.S. 90, 104 (1980); see also Fabrikant II, 722 F. Supp. 2d at 257 (concluding that "[f]or the same reasons that plaintiff is estopped from relitigating the probable cause issue with respect to her First Amendment claim, she is also prevented from disturbing the state court's determination that the search warrant was supported by probable cause," and that "the determination that defendants had probable cause to arrest her is fatal to her claim for false arrest").

16

As for the remaining state-law claims, the district court declined to exercise supplemental jurisdiction over them, "[i]n light of the decision to dismiss the federal causes of action." Fabrikant II, 722 F. Supp. 2d at 257.

Fabrikant again appealed.

V.    The Present Appeal

We appointed pro bono appellate counsel for Fabrikant and directed counsel to "exercise professional judgment in deciding which arguments to pursue on appeal, with the court directing only that, in pursuing any due process claim, counsel brief whether the SPCA and its employees and agents acted under color of state law in taking any challenged action, including whether they spayed and neutered appellant's animals pursuant to New York Agriculture & Markets Law § 377-a(2)." In addition, after oral argument we requested supplemental briefing on the issue of qualified immunity, specifically directing the parties to address three questions:

> (a) Were the purported substantive and procedural due process rights asserted by Fabrikant "clearly established" at the time of the SPCA's decision to spay and neuter the animals?
>
> (b) Can qualified immunity be predicated on a conclusion that, even if it was "clearly established" that the actions of the SPCA officials, if committed by a police officer, violated the due process clause, it was not "clearly established" that similar actions by officials of the SPCA are taken under color of state law?
>
> (c) Can this Court make a qualified immunity determination on the present record, or should the issue be decided by the district court on remand?

17

The parties have filed supplemental briefs in response to that order, and have also submitted letters to the Court, pursuant to Federal Rule of Appellate Procedure 28(j), regarding the Supreme Court's June 4, 2012, decision in Reichle v. Howards, 132 S. Ct. 2088 (2012), which concerns qualified immunity.

## DISCUSSION

We review a district court's grant of summary judgment de novo, see Nagle v. Marron, 663 F.3d 100, 104-05 (2d Cir. 2011), and will affirm only if, construing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 137 (2d Cir. 2010) (internal quotation marks and brackets omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Likewise, "conclusory statements or mere allegations" will not suffice to defeat a summary judgment motion. Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).

On this appeal, Fabrikant argues that genuine issues of material fact remain on each of her federal claims, and that the district court therefore erred in granting summary judgment for defendants. Specifically, she argues (1) that the district court erred by concluding that the SPCA defendants "did not act under color of state law when they

18

spayed and neutered" Fabrikant's dogs; (2) that the district court "erred by giving preclusive effect to the state court's determination regarding the facial validity of the search warrant"; and (3) that genuine issues of material fact remain regarding whether the SPCA defendants "acted without probable cause to forcibly enter Ms. Fabrikant's home, arrest her, seize her animals, and prosecute her," because (a) "there is evidence in this case that [SPCA] investigators knew or should have known from their own observations that the information in the affidavit in support of the search warrant was misleading and/or false," and because (b) the district court "improperly substituted its judgment for that of the jury and found probable cause based largely on post-arrest video and photo evidence that shows no violations of" New York law, "but instead shows a messy house."

We agree with the district court that no genuine issues of material fact remain on any of Fabrikant's federal claims, and that defendants are entitled to summary judgment. However, we reach that conclusion for reasons different in some respects from those articulated by the district court. See Bruh v. Bessemer Venture Partners III L.P., 464 F.3d 202, 205 (2d Cir. 2006) (observing that "we may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court"). Most notably, we disagree with part of the district court's state-action analysis. We conclude that the SPCA defendants engaged in state action when they performed surgery on the seized dogs prior to sending them to foster homes. However, we also conclude that, as state actors, those defendants are entitled to qualified immunity, because the due process rights asserted by Fabrikant were not "clearly established" at the time of defendants' challenged actions.

I.      State Action

We have not previously addressed whether a private animal-rescue organization

and its employees and agents act under color of state law for purposes of 42 U.S.C.

§ 1983 when they perform surgery on seized pets against the owner's wishes or without

the owner's knowledge.  This case therefore presents an issue of first impression for our

Court.[10]

Section 1983 provides that "[e]very person who, under color of any [state] statute,

ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws, shall be liable

to the party injured in an action at law, suit in equity, or other proper proceeding for

[10] Cf. Garraway v. Julian, 106 F. App'x 745, 745-46 (2004) (summary order) (concluding that plaintiff's suit against Humane Society's administrator for detention of dog was collaterally estopped "because the New York State Supreme Court . . . ruled that the dog did not belong to [plaintiff]" and plaintiff therefore lacked standing, and declining to reach the issue of whether administrator was a state actor).  Several other circuits have touched on related but not identical issues, reaching varying results on records differing in various ways from the present case.  See, e.g., Crawford v. Van Buren County, 678 F.3d 666, 670-71 (8th Cir. 2012) (noting that Humane Society defendants were private actors, and holding that plaintiff's § 1983 claims against those defendants for seizure of her dogs failed because she had presented "no evidence amounting to a civil conspiracy" between the Humane Society and state officials); Bogart v. Chapell, 396 F.3d 548, 563 (4th Cir. 2005) (concluding that "the random and unauthorized euthanization" of plaintiff's animals by Humane Society and county defendants, "however atrocious," "did not constitute a violation of [plaintiff's] procedural due process rights because a meaningful postdeprivation remedy for the loss is available"); Brunette v. Humane Soc'y of Ventura County, 294 F.3d 1205, 1208 (9th Cir. 2002) (noting that the Ventura County Humane Society "was created by special California statute" and "engages in a quasi-public function," and that its officers "are invested with authority to investigate reports of animal cruelty, impound animals, place liens on property, and bring criminal charges against citizens," and holding that the "Society and its officers are state actors for the purposes of § 1983").

20

redress." 42 U.S.C. § 1983. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action." Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003); see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2 ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes.").

"[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999), quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982) (emphasis omitted). "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action." Rendell-Baker v. Kohn, 457 U.S. 830, 847 (1982) (internal quotation marks omitted). But a private entity does not become a state actor for purposes of § 1983 merely on the basis of "the private entity's creation, funding, licensing, or regulation by the government." Cranley v. Nat'l

21

Life Ins. Co. of Vt., 318 F.3d 105, 112 (2d Cir. 2003).  Rather, "there must be such a close nexus between the [s]tate and the challenged action" that the state is "*responsible* for the specific conduct of which the plaintiff complains."  Id. at 111 (internal quotation marks omitted).

Supreme Court cases on the subject of state action "have not been a model of consistency," and we therefore have "no single test to identify state actions and state actors.  Rather, there are a host of factors that can bear on the fairness of an attribution of a challenged action to the State."  Cooper v. U.S. Postal Serv., 577 F.3d 479, 491 (2d Cir. 2009) (internal quotation marks omitted).  Three main tests have emerged:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (internal quotation marks, brackets, and punctuation omitted).  The fundamental question under each test is whether the private entity's challenged actions are "fairly attributable" to the state.  Rendell-Baker, 457 U.S. at 838; see also Am. Mfrs. Mut. Ins. Co., 526 U.S. at 50; Cooper, 577 F.3d at 491.

22

In analyzing whether a private entity acts under color of state law for purposes of § 1983, we begin "by identifying the specific conduct of which the plaintiff complains," rather than the general characteristics of the entity. Sullivan, 526 U.S. at 51 (internal quotation marks omitted). Here, the district court followed that injunction, and separately analyzed the different actions at issue in the case, concluding that while the SPCA defendants who searched Fabrikant's house, seized the dogs, and arrested her engaged in state action, those defendants who had the animals spayed or neutered did not act on behalf of the state. On appeal, Fabrikant argues that *all* of these activities constituted state action, because the SPCA acted according to powers granted it by New York's Agriculture and Markets Law, which requires that animal rescue organizations spay or neuter pets before they are sent to adoptive homes, and because the SPCA has been delegated a public function – animal control[11] – by the state. The SPCA defendants respond that they acted not according to powers granted to the SPCA by New York law or pursuant to any delegation of authority, but rather solely according to the SPCA's private internal policies.

We need not resolve whether the spaying and neutering were compelled primarily by New York law or only by SPCA internal policy, and whether the dogs were "adopted"

---

[11] By "animal control," we mean the regulation of privately owned animals for the purpose of protecting those animals or the community. Animal control includes such activities as investigating animal cruelty, impounding or confiscating animals, and bringing criminal charges against citizens. See, e.g., Brunette, 294 F.3d at 1208. The phrase does not refer to private activities involving wild or threatening animals, such as the control of pests or self-defense against animal attacks.

23

for purposes of New York law or merely temporarily "fostered," because those issues are ultimately immaterial to this appeal. The spaying and neutering of the dogs, like the search and arrest, constituted state action because they were part of the state function of animal control delegated to the SPCA by state law. Those actions, indeed, would not have been possible but for the SPCA defendants' prior state action. See West v. Atkins, 487 U.S. 42, 49 (1988). The only reason defendants had the opportunity to spay and neuter the dogs was that defendants had already seized them by exercising investigatory and law-enforcement powers – powers that indisputably constitute state action. The spaying and neutering flowed from, and are inexorably tied to, defendants' investigative and enforcement activities.

Indeed, the dogs were in the custody of the SPCA, and subject to its decisions about their appropriate care, as a result of a specific delegation of authority from the state. The state court ordered that the seized dogs remain in SPCA custody pending Fabrikant's criminal proceedings, but allowed the animals not seized to remain on Fabrikant's property. Under state law, such an order may not even have been necessary for the SPCA to maintain custody of the seized dogs, given that the New York Agriculture and Markets Law "does not set forth any procedure for the return of animals" seized by an animal control organization, and in fact "conveys authority upon" the SPCA "to humanely destroy an animal already in its lawful possession." Montgomery County SPCA v. Bennett-Blue, 681 N.Y.S.2d 106, 107 (3d Dep't 1998); see N.Y. Agric. & Mkts. Law §§ 373, 374. Thus, whether by court order or statute, it is clear that the dogs were placed under the continuing control of the SPCA by operation of state authority.

Defendants have not cited and we have not found any case, from our circuit or any other, in which a court treated an animal control organization's investigatory activities and seizure of animals as state action, but its spaying and neutering of such animals as private action. To the contrary, the few courts that have addressed this issue have drawn no such distinction. See, e.g., Daskalea v. Wash. Humane Soc'y, 480 F. Supp. 2d 16, 27-28 (D.D.C. 2007) (deeming the Humane Society a state actor for purposes of § 1983 when it searched plaintiffs' home and seized and sterilized their dog). Furthermore, we see no reason to draw a distinction between the SPCA's searches and seizures and its subsequent surgery and fostering of animals. Such a distinction is not contemplated by New York's Agriculture and Markets Law. Indeed, state law grants municipalities the authority to delegate broad animal-control powers to private organizations such as the SPCA. See N.Y. Agric. & Mkts. Law §§ 113, 114, 373(1), (2), (4), (6). Were it not for that delegation of authority, the SPCA's sterilization of these dogs without Fabrikant's consent would have been tortious or even criminal; private individuals or associations acting on their own authority would have no right to interfere with animals that were the property of another person.

In operating on Fabrikant's dogs following their seizure, however, the SPCA defendants were not acting in a private capacity, but were exercising "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). Animal control is part of the state's police power. More than a century ago, the Supreme Court recognized:

25

> Acting upon the principle that there is but a qualified property in [dogs], and that, while private interests require that the valuable ones shall be protected, public interests demand that the worthless shall be exterminated, they have, from time immemorial, been considered as holding their lives at the will of the legislature, and properly falling within the police powers of the several states. . . .
>
> Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.

Sentell v. New Orleans & C.R. Co., 166 U.S. 698, 701-02, 704 (1897); see also Nicchia v. New York, 254 U.S. 228, 230 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right."). The sterilization of seized dogs falls within this police power, and constitutes what our Court has called, in another context, "'a function traditionally associated with sovereignty.'" Horvath v. Westport Library Ass'n, 362 F.3d 147, 152 (2d Cir. 2004), quoting Hollenbaugh v. Carnegie Free Library, 545 F.2d 382, 383 (3d Cir. 1976). New York has permitted municipalities to delegate that public function – sterilizing seized animals against their owners' wishes – to private animal control organizations, see N.Y. Agric. & Mkts. Law § 114, but the function "has been traditionally the *exclusive* prerogative of the state," Rendell-Baker, 457 U.S. at 842 (internal quotation marks omitted). Accordingly, defendants' actions

26

satisfied the "public function test."  See Sybalski, 546 F.3d at 257, 259.[12]

Our conclusion is further supported by decisions of the Supreme Court and of our own, with distinct but analogous facts.  In West v. Atkins, the Supreme Court held that a physician employed by a state as an independent contractor "to provide medical services to state prison inmates" acted "under color of state law for purposes of § 1983 when undertaking his duties in treating [an inmate's] injury."  487 U.S. at 54.  He had exercised power "possessed by virtue of state law and made possible only because [he was] clothed with the authority of state law."  Id. at 49.  Likewise, in Cooper v. United States Postal Service, our Court concluded that Sincerely Yours, Inc. ("SYI"), a church-related not-for-profit business incorporated for the purpose of operating a Contract Postal Unit ("CPU") with the U.S. Postal Service ("USPS"), operated as a state actor under the "public function test" when it performed postal activities.  577 F.3d at 491-93.  We noted that

---

[12] Cases in which an SPCA has been found not to be a state actor are easily distinguishable.  In Robbins v. Cloutier, for example, we held that an SPCA did not engage in state action in firing one of its peace officers, but noted that the organization may be a state actor for § 1983 purposes with respect to its provision of animal-control services.  121 F. App'x 423, 424 (2d Cir. 2005) (summary order).  See also Petrusa v. Suffolk County SPCA, No. 05-CV-6017, 2009 WL 1796996, at *5 (E.D.N.Y. June 24, 2009) (concluding that while the Suffolk County SPCA "may be regulated by the state and therefore some actions taken by its peace officers in performing animal control services or enforcing its regulations might qualify as state action within the meaning of § 1983, in the context of making employment decisions or implementing internal personnel policies, the SCSPCA does not perform a governmental function that warrants an inference of state action" (citation omitted)); cf. Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 527 (2d Cir. 1996) ("The fact that a municipality is responsible for providing medical attention to persons held in custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided, but that fact does not make the contractor a state actor with respect to its employment decisions." (citations omitted)).

27

"Congress granted to the USPS the exclusive duty to . . . participate in the safe carriage of mail"; that, as to safe carriage, Congress had "conferred to the Postal Service a complete monopoly," which "entails the sale of postage for letters, acceptance of mail for transmission, and the marking and processing of mail for delivery"; and that SYI and other CPUs performed all of these functions. Id. at 492-93. We therefore concluded "that SYI is a state actor under the public function test because it performs – at least in some parts of the facility – activities that traditionally have been the exclusive, or near exclusive, function of the State." Id. at 493 (internal quotation marks and brackets omitted).

The reasoning of West and Cooper extends to the present case. Just as "only the State may legitimately imprison individuals as punishment for the commission of crimes," and thus the "[a]cts of prison employees will therefore almost certainly be considered acts of the State whatever the terms of their employment," Horvath, 362 F.3d at 151-52, citing West, 487 U.S. at 54-57, only the state (or agents to whom it delegates its police power) may seize animals and operate on them against their owner's wishes. And just as a private entity engages in state action when it performs the delegated Postal Service functions of selling stamps, accepting mail for transmission, and marking and processing mail for delivery, see Cooper, 577 F.3d at 493, so too does the SPCA engage in state action when it exercises delegated police powers, and when it takes actions that are possible only because of the state's delegation of those powers.

28

The SPCA is not merely "a business affected with the public interest," "subject to extensive regulation," subsidized by the public, or "given monopoly status by the state." Chan v. City of New York, 1 F.3d 96, 106 (2d Cir. 1993) (internal quotation marks omitted).  Nor, when it seizes and maintains custody of dogs in connection with its law-enforcement activities, does it merely act in parallel to the state, carrying out for its own purposes activities analogous to those performed by the state for state purposes – as it might, for example, in providing medical services to animal owners at their request, or to stray animals it undertakes to shelter.  On the contrary, when the SPCA, operating under the delegated animal-control authority provided by New York's Agriculture and Markets Law, seizes animals from their owners and then sterilizes them, it acts under color of state law because it performs an exclusively public function that has been delegated to it by the state.  See United States v. Stein, 541 F.3d 130, 147 (2d Cir. 2008).  The SPCA's spaying and neutering of the seized dogs was "made possible only because the [SPCA was] clothed with the authority of state law."  United States v. Classic, 313 U.S. 299, 326 (1941).[13]

_____

[13] Other courts have recognized that where private actors perform powers traditionally reserved for police officers, the private actors can be considered state actors.  See, e.g., Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 629 (7th Cir. 1999) ("[I]f the state cloaks private parties with virtually the same power as public police officers, and the private actors allegedly abuse that power to violate a plaintiff's civil rights, that plaintiff's ability to claim relief under § 1983 should be unaffected."); see also Romanski v. Detroit Entm't, LLC, 428 F.3d 629, 638-39 (6th Cir. 2005) (holding that private casino officers licensed by the state and empowered to make warrantless arrests for any offense on the casino's premises were state actors, because plenary arrest authority is traditionally the exclusive preserve of the state); but see Wade v. Byles, 83 F.3d 902, 906 (7th Cir. 1996)

On the facts of this case, in taking custody of the dogs and making decisions about their proper maintenance and care, the SPCA officials were simply following up on the initial seizure of the dogs, which concededly was state action. Just as the police maintain custody of the property of an arrested person, so too did the SPCA undertake to safeguard Fabrikant's property – the dogs – after her arrest and their seizure. Thus, there is "a sufficiently close nexus between the State and the challenged action of the [SPCA] that the action of the latter may be fairly treated as that of the State itself" for purposes of § 1983. Jackson, 419 U.S. at 351.[14]

We therefore conclude that animal rescue organizations such as the SPCA – independent contractors to which, under New York law, municipalities can delegate authority to perform animal control – are state actors for purposes of § 1983 when they perform surgery on animals in their care while those animals are being kept from their

(holding that a building security guard who was authorized by the state to use deadly force in self-defense, arrest people for criminal trespass pending arrival of the police, and carry a handgun was not a state actor because none of his powers were the exclusive preserve of the state). Here, the SPCA peace officers clearly enjoy powers that are the traditional preserve of the state, and the parties agree that the search of Fabrikant's home and seizure of the dogs constituted state action. The SPCA's subsequent sterilization and fostering of the dogs was made possible only because the officers had previously exercised powers granted them by New York law and traditionally reserved for police officers.

[14] Thus, it does not matter whether state law specifically compelled, authorized, or even forbade spaying or neutering of dogs under these circumstances. Having been vested with custody of Fabrikant's property as part of its delegated state-law enforcement responsibilities, the SPCA, in choosing how to exercise its custodial function, engaged in state action – just as a police officer's activities in maintaining custody of an arrestee's property is state action, regardless of whether the officer's particular action is compelled, authorized, or forbidden by state law. Cf. Hudson v. Palmer, 468 U.S. 517, 532 (1984).

owners by the authority of the state, following searches and seizures carried out by the agencies pursuant to warrants.

II.    Qualified Immunity

Our conclusion regarding state action does not end our inquiry, however, or compel reversal of the district court's decision.  To the extent that the SPCA defendants are subject to the obligations imposed on state actors, they also share the immunities the law extends to those actors.  For reasons explained below, defendants are entitled to qualified immunity for spaying and neutering Fabrikant's seized dogs prior to sending them to foster homes.

A.  Forfeiture

As an initial matter, Fabrikant contends that the defendants involved in the spaying and neutering of her dogs waived or forfeited their qualified immunity defense by failing to raise it in the district court or in their initial briefing to our Court – indeed, waiting to unleash it until oral argument.[15]  Although the defense of qualified immunity can indeed be forfeited, see, e.g., McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997), we nevertheless have the power to consider it.  That we generally ignore arguments advanced for the first time on appeal (or, as here, at oral argument) is a "prudential" rule, "not [a] jurisdictional" one:

_____

[15] In the district court, the parties' state-action arguments focused on Spinato and Sasse, the SPCA peace officers.  Those defendants raised a qualified immunity defense, although the other SPCA defendants did not.

31

> [W]e have discretion to consider waived arguments. We have exercised this discretion where the argument presents a question of law and there is no need for additional fact-finding. The matter of whether a right was clearly established at the pertinent time is a question of law.

Dean v. Blumenthal, 577 F.3d 60, 67 n.6 (2d Cir. 2009) (internal quotation marks, ellipsis, and citations omitted). In addition, in the district court, defendants argued that Spinato and Sasse were the only defendants who "may be found to have been 'acting under color of state law,'" and that none of the other defendants were state actors. In light of defendants' state-action argument, it is understandable that none of the defendants other than Spinato and Sasse claimed qualified immunity. Finally, qualified immunity is fundamentally different from other affirmative defenses – "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). For these reasons, we will exercise our discretion to consider the applicability of the qualified immunity defense to all defendants.

B. Analysis

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutorily or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

32

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and brackets omitted). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Id. (internal quotation marks and ellipsis omitted). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231 (internal quotation marks omitted).

The due process right asserted by Fabrikant – her right not to have her dogs sterilized by the SPCA, at least without some form of process, prior to being sent to foster homes while she was awaiting trial in state court on animal abuse charges – is not a right that was "clearly established" at the time of defendants' challenged actions in 2002. Nor has the right achieved that status today. It was not then, and is not now, "sufficiently clear that every reasonable official would have understood" that spaying or neutering Fabrikant's dogs following their seizure from her home violates a clearly established due process right. See Reichle, 132 S. Ct. at 2093 (internal quotation marks and brackets omitted). Fabrikant cites no binding precedent that comes close to establishing that the

33

asserted due process right was clearly established in 2002.[16] In fact, she appears to concede that no such binding authority exists; instead, she argues that we should extend existing precedent to prohibit defendants' behavior and to find that the due process right that she has asserted on this appeal was clearly established in 2002. That argument, however, is foreclosed by Reichle and other recent Supreme Court jurisprudence, which recognizes that although "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). Here, as in Reichle and al-Kidd, the question "falls far short of that threshold." Id.

---

[16] The two out-of-circuit cases that Fabrikant cites, from the Seventh and Tenth Circuits, are plainly inapposite, as well as not binding on this Court. Neither case deals with spaying or neutering. In Porter v. DiBlasio, 93 F.3d 301 (7th Cir. 1996), Humane Society officials seized plaintiff's horses without immediately notifying plaintiff. The Society then sent a letter to plaintiff's attorney that the horses would be treated as strays and put up for adoption unless plaintiff paid boarding charges within five days, as required by state statute. Plaintiff failed to pay, and the horses were adopted. At issue in the case was whether plaintiff had sufficiently pled violations of procedural and substantive due process to survive a Rule 12(b)(6) motion to dismiss. The court concluded that plaintiff had sufficiently pled a violation of procedural due process and was entitled to a hearing before the termination of his ownership interest, id. at 306-08, but that his substantive due process and takings claims failed because the seizure and "disposal" of the animals fell within the state's police power, id. at 310. In DiCesare v. Stuart, 12 F.3d 973 (10th Cir. 1993), county officials seized plaintiff's sick horses and sold them to satisfy a county lien. The court noted that it was "beyond argument that the officers had probable cause to seize the horses" because the animals were in "poor condition," and because "Oklahoma law gave the officers the right to take them into custody immediately." Id. at 977. However, the Court held that "the statutory scheme under which [the] horses were sold makes no provision for a hearing at any time," and thus "[c]ompliance with the statute . . . did not provide [plaintiff] with due process." Id. Plainly, neither case comes close to "clearly establish[ing]" the rights that Fabrikant asserts here. See Reichle, 132 S. Ct. at 2093.

34

Indeed, by spaying and neutering Fabrikant's dogs and sending them to foster homes, the SPCA appears to have acted well within the bounds of New York Agriculture and Markets Law § 373. The Agriculture and Markets Law grants SPCAs and Humane Societies broad powers to promote the welfare of at-risk animals. E.g., N.Y. Agric. & Mkts. Law §§ 372, 373(1), (2), (4). New York courts have consistently recognized the breadth of those powers. See, e.g., Hand v. Stray Haven Humane Soc. & SPCA, Inc., 799 N.Y.S.2d 628, 631 (3d Dep't 2005). As already noted, New York courts have held that § 373 "does not set forth any procedure for the return of animals." Montgomery County SPCA, 681 N.Y.S.2d at 107. And in a tort suit brought by an owner after a local Humane Society had *euthanized* her animals following a lawful search of her home, the court concluded that the Society's conduct was statutorily authorized by New York Agriculture and Markets Law § 373, and was therefore "not sufficiently outrageous and egregious" to support the owner's claim for intentional infliction of emotional distress. Kyprianides v. Warwick Valley Humane Soc., 873 N.Y.S.2d 710, 711 (2d Dep't 2009). In the present case, by contrast, the animals were not put down. Rather, they were treated for medical ailments, spayed or neutered, and sent to foster homes – actions that appear to have been permitted under the Agriculture and Markets Law.

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson, 555 U.S. at 244. In light of the broad powers granted to the SPCA and similar organizations by the New York Agriculture & Markets Law, a reasonable person in the

35

position of the SPCA defendants would not have known that spaying and neutering

Fabrikant's dogs prior to sending them to foster homes pending her trial on animal abuse

charges violated Fabrikant's clearly established constitutional or statutory rights.[17]

Accordingly, although they acted under color of state law, the SPCA defendants cannot

be held liable for the spaying, neutering, or fostering out of Fabrikant's dogs.

III.     Probable Cause

Fabrikant's remaining federal claims fail because the search of Fabrikant's home

and her arrest were supported by probable cause.

The United States Constitution provides persons the right to be free from

unreasonable searches and arrests.  U.S. Const. amend. IV.  "Ordinarily, an arrest or

search pursuant to a warrant issued by a neutral magistrate is presumed reasonable

because such warrants may issue only upon a showing of probable cause."  Walczyk v.

Rio, 496 F.3d 139, 155-56 (2d Cir. 2007).  "A plaintiff who argues that a warrant was

issued on less than probable cause faces a heavy burden."  Rivera v. United States, 928

F.2d 592, 602 (2d Cir. 1991).  In a civil rights action, to challenge the probable cause for

a search warrant, "the plaintiff must make a substantial preliminary showing that the

affiant knowingly and intentionally, or with reckless disregard for the truth, made a false

---

[17] Of course, we do not suggest that state law may authorize conduct that clearly violates federal constitutional rights.  We merely note that, in the absence of clearly established federal law to the contrary, a state actor who relies on state law authorizing his behavior is unlikely to be found to have acted unreasonably in believing his conduct to be lawful.

36

statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (internal quotation marks omitted).

Probable cause for an arrest "requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks omitted). As we have explained:

> When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty. Courts should look to the totality of the circumstances and must be aware that probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules. Nevertheless, an officer may not disregard plainly exculpatory evidence.

Id. (internal quotation marks, brackets, emphasis, and citations omitted). In addition, "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989) (internal quotation marks omitted).

The existence of probable cause will defeat a claim of malicious prosecution and unreasonable search and seizure. See Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003); Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). It will also

37

defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence her. "An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause," even if that prosecution "is in reality an unsuccessful attempt to deter or silence criticism of the government." Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992); see also Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995).

As an initial matter, Fabrikant argues that the district court erroneously relied on probable cause determinations made by the state court during Fabrikant's criminal proceedings. She contends that the issue of probable cause was not actually decided in those proceedings, and that Fabrikant never received the full and fair opportunity to litigate the issue there. To the extent the district court's opinion can be read to treat Fabrikant's probable cause argument as collaterally estopped by her state court case, we agree with Fabrikant that the district court erred. See Allen v. McCurry, 449 U.S. 90, 101 (1980) ("Collateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court."); Golino, 950 F.2d at 869. However, that error does not require reversal. The district court proceeded to explain that, "as already discussed . . . , there was probable cause" to support the search, arrest, and prosecution. See Fabrikant II, 722 F. Supp. 2d at 256. We affirm that holding of the district court without endorsing its

collateral estoppel analysis.[18]

We agree with the district court that Fabrikant's claims of malicious prosecution, unreasonable search and seizure, and First Amendment retaliation fail because defendants had probable cause to believe Fabrikant committed animal cruelty. Crucially, Fabrikant does not contest that multiple witnesses reported to the SPCA that Fabrikant was abusing of her animals; she merely argues that the witnesses were lying. In her deposition, Fabrikant testified:

> Since it's not the truth that I hurt my animals, abused my
> animals, neglected the animals and, therefore, they are coming
> to accuse me of that and seizing them was based upon a lie,
> it's my assessment that they all got together to put the lie
> together somehow; that they chose to do whatever they

---

[18] Nor do we endorse the district court's observation that Fabrikant offered "no opposition to defendants' argument with respect to her free speech claim despite being granted permission to submit a memorandum of law in excess of the traditional twenty-five pages afforded litigants under" the local rules. Fabrikant II, 722 F. Supp. 2d at 257. This passage could be read as suggesting that Fabrikant waived an argument in opposition to defendants' summary judgment motion. If that is what the district court meant, it erred. Federal Rule of Civil Procedure 56 provides that if a party fails to properly support or address another party's assertion of fact, the court may "grant summary if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). We have "made clear" that where a nonmoving party "chooses the perilous path of failing to submit a response to a summary judgment motion," the district court still has an obligation to determine whether summary judgment is appropriate. Vt. Teddy Bear Co. v. 1-800-Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (internal quotation marks omitted). If the evidence submitted with the summary judgment motion fails to meet "the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented*." Id. (emphasis added) (internal quotation marks omitted). Here, the district court gave ample reason that Fabrikant's First Amendment claim failed as a matter of law beyond Fabrikant's failure to oppose this part of defendants' summary judgment motion. Accordingly, this passage of the district court's opinion does not require reversal.

needed to do in order to assemble the lie. And I'm not sure of who played what role in the lie, but a lie happened, because I know that I didn't do what they say that I did. I know that their depositions were false.

I know that my animals were not abused and neglected. I know that they painted a picture of me to be different than what the truth was and in order to do that, they had to assemble a lie and make it appear that neglect happened.

However, later in the deposition, Fabrikant admitted that she had no evidence that defendants conspired against her, "other than [her] own assessments based upon the final result, which is that false and baseless charges were brought against me."

That is insufficient as a matter of law to raise a factual issue as to the officers' belief in the validity of the warrant and the information on which it was based. "[I]nformation gleaned from informants can be sufficient to justify the existence of probable cause. . . . [A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." Panetta, 460 F.3d at 395 (internal quotation marks and citations omitted); see also Finigan v. Marshall, 574 F.3d 57, 61-62 (2d Cir. 2009). "Moreover, information provided by an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy, and . . . an identified citizen informant is presumed to be reliable." Panetta, 460 F.3d at 395 (internal quotation marks and citation omitted).

Fabrikant has failed to raise any genuine issue of material fact as to the motives of the complaining witnesses. Instead, she makes only vague claims about the witnesses'

40

conspiring against her, even though she admitted in her deposition that she had no evidence of any such conspiracy. Here, the complaining witnesses' "status as [] identified citizen informant[s] provide[s] an indicia of reliability," and "the fact that [their] descriptions . . . were based on eyewitness accounts also carries additional weight in assessing the reasonableness of [the investigators'] probable cause determination." Id. at 397.

Furthermore, Fabrikant also does not materially contest the conditions observed by SPCA investigators themselves during the course of the search of her home; instead, she attempts to characterize those conditions in a more favorable light than SPCA investigators viewed them – "a messy house," for example, rather than conditions constituting animal cruelty. But even assuming that Fabrikant's explanations are plausible, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985). Here, the conditions observed by the investigators during the search – including, for example, the bags filled with animal feces and the dogs' untreated medical conditions – are not in dispute, and suffice to establish probable cause for Fabrikant's arrest and prosecution for animal cruelty.

Fabrikant further contends that because the SPCA investigators visited her house on prior occasions and did not see fit to cite or arrest her on those visits, then they could have had no basis for obtaining a search warrant and searching her home at a later date, and they should have known that the complaining witnesses were mistaken or lying about

41

the conditions they claimed to have observed in Fabrikant's home. This argument is wholly unavailing. That the investigators made multiple visits before applying for a warrant is unsurprising, given that they had not received all of the witness statements at the time of their visits. Furthermore, those witnesses described specific conditions and actions on Fabrikant's part that might not necessarily have been present during the investigators' initial visits to the home. In any event, an investigator's initial efforts to gather information about a suspect – even if those initial efforts do not immediately result in an arrest – plainly do not foreclose the ability of the investigator to seek a search warrant against that suspect at a later time.

Next, Fabrikant insists that, in evaluating the probable cause question as it relates to her arrest, the video recording made by investigators during the search is "irrelevant" because defendants had "presumably" decided to arrest Fabrikant before they entered the house, and because "the video was made after the arrest." In her view, we may consider only what the investigators knew before they reached the house and began the search, because they had decided ahead of time that they were going to arrest Fabrikant, and thus the actual conditions at the house at the time of the arrest should not affect the analysis of whether they had probable cause to arrest her. That argument misses the mark. "Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it." Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996); see also Warren v. Dwyer, 906 F.2d 70, 73 (2d Cir. 1990) ("[P]robable cause encompasses only that information available to the arresting officer

42

prior to and including the point of seizure."). Here, Fabrikant has set forth no evidence to support her assertion that the investigators decided ahead of time that they would arrest her. And even if there were such evidence, as a matter of law the relevant question is not the officers' subjective motivation for making an arrest, but whether objectively they had probable cause. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). At the time of the arrest and immediately before it, the undisputed facts available to the investigators only bolstered the conclusion that Fabrikant had committed animal cruelty.

At bottom, Fabrikant's arguments attempt to turn the question of probable cause on the issue of whether she *actually committed* animal cruelty. But that issue, while determinative of her guilt or innocence on the state criminal charges, does not create a genuine issue of material fact as to the existence of probable cause for the search of Fabrikant's house, the seizure of the animals, and Fabrikant's arrest. The question is whether there was a basis for a reasonable officer to *believe*, even if incorrectly, that Fabrikant was committing animal cruelty. See Panetta, 460 F.3d at 395. We agree with the district court that the summary judgment record – including the allegations made by multiple witnesses to the SPCA, the officers' firsthand observations during their initial visits and during the execution of the search warrant, and Fabrikant's own admissions about her inability to care for the dogs – allows for no conclusion other than that defendants had probable cause to believe Fabrikant committed animal cruelty.

43

Because probable cause existed to search Fabrikant's house, arrest her, and prosecute her for animal cruelty, and because defendants are entitled to qualified immunity, Fabrikant's malicious prosecution, unreasonable search and seizure, and First Amendment retaliation claims must fail.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.