*14-1469-cv*
*Ya-Chen Chen v. City University of New York, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2014

(Argued: March 25, 2015　　　Decided: October 28, 2015)

No. 14-1469-cv

_____

YA-CHEN CHEN,

*Plaintiff-Appellant*,

-v.-

THE CITY UNIVERSITY OF NEW YORK, ROBERT PAASWELL, Individual and Official
Capacity, BETH LESEN, Individual and Official Capacity, RICHARD F. CALICHMAN,
Individual and Official Capacity, GERALDINE MURPHY, Individual and Official
Capacity,

*Defendants-Appellees*.

_____

Before: Winter, Livingston, and Chin, *Circuit Judges*.

Plaintiff-Appellant Ya-Chen Chen brought suit against the City University
of New York ("CUNY") and four of its employees (the "Individual Defendants")
in the United States District Court for the Southern District of New York
(Abrams, *J.*).  She argued, *inter alia*, that CUNY violated Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.*, and that the Individual Defendants
violated the Equal Protection Clause of the Fourteenth Amendment and the New

1

York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107, because they discriminated against her on the basis of her gender, race, and national origin, and retaliated against her for a complaint that she filed against several of the Individual Defendants. Following discovery, the district court granted summary judgment to CUNY and the Individual Defendants on all of Chen's claims. We conclude that the district court correctly decided that, based on the evidence presented, no reasonable jury could find that either CUNY's or the Individual Defendants' actions were motivated, even in part, by a desire to discriminate or retaliate against Chen. Accordingly, the judgment of the district court is **AFFIRMED**.

Judge CHIN concurs in part and dissents in part in a separate opinion.

FOR PLAINTIFF-APPELLANT:             MATTHEW S. PORGES, Law Office of Matthew S. Porges, Esq., Brooklyn, NY.

FOR DEFENDANTS-APPELLANTS:           DAVID LAWRENCE III, Assistant Solicitor General, Barbara D. Underwood, Solicitor General, Michael S. Belohlavek, Senior Counsel, *for* Eric T. Schneiderman, Attorney General of the State of New York, New York, NY.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Beginning in September 2007, Plaintiff-Appellant Ya-Chen Chen served as an assistant professor of Asian Studies in the Department of Foreign Languages and Literatures at the City College of New York ("CCNY"), a school in the City University of New York ("CUNY") system. She also acted as Interim Director of the Asian Studies program during the 2008-2009 academic year. As that school year drew to a close, Chen had a negative encounter with a student. Members of

2

the administration — including Defendants-Appellants Beth Lesen, Richard F. Calichman, and Geraldine Murphy — informed Chen that, in their view, she had handled the incident inappropriately. Chen disagreed with this assessment and expressed her opinion to those administrators. In July 2009, CCNY informed Chen that she would not be reassigned to a second year as Interim Director of the Asian Studies program. Several months later, CCNY's Department of Foreign Languages and Literatures undertook its annual review of assistant professors, who must be reappointed each year until they receive tenure. The Department decided against reappointing Chen for the 2010-2011 academic year. Chen unsuccessfully appealed this decision through two stages of administrative review, and finally to CCNY's President, Defendant-Appellant Robert Paaswell.

Following her appeals, Chen filed suit against CUNY, Calichman, Lesen, Murphy, and Paaswell in the United States District Court for the Southern District of New York (Abrams, *J.*). She argued that CUNY violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.*, and that the individual defendants violated the Equal Protection Clause and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107, because they discriminated against Chen on the basis of her race, gender, and national origin,

3

and retaliated against her for an internal complaint that she filed against Calichman, Lesen, and Murphy in August 2009. Following discovery, the district court granted summary judgment to the defendants on all of Chen's claims. We agree with the district court's decision, and therefore affirm.

## BACKGROUND

### A. Factual Background

#### 1. Chen's Employment at CCNY

CCNY is the flagship institution in the CUNY system. To identify and attract talented educators and scholars, the College hires them as assistant professors — a tenure-track position subject to annual review and renewal. Every year, an executive committee in each of CCNY's departments evaluates the assistant professors under its jurisdiction before deciding whether to reappoint them. The committees consider the candidates' "teaching effectiveness," "scholarly and professional growth," "service" to the public and the institution, J.A. 180, and whether candidates demonstrate "satisfactory qualities of personality and character . . . and [a] willingness to cooperate with others for the good of the institution." J.A. 166. As assistant professors move closer to tenure,

4

the evaluations become "progressively rigorous . . . to reflect the greater expectations of more experienced faculty members." J.A. 181.

In September 2007, Chen secured a position as an assistant professor of Asian Studies in CCNY's Department of Foreign Languages and Literatures. Chen, a Taiwanese woman, is a scholar in the fields of East Asian languages and cultures, Chinese comparative literatures, and women's and gender studies. She holds degrees from the National Sun Yat-sen University in Taiwan, Columbia University, and Purdue University, and has published three books and over twenty articles in academic journals.

During the 2007-2008 school year, Chen taught two Chinese courses in the fall, worked on two books and several academic articles, and undertook several projects within the Asian Studies program. In Chen's annual evaluation, Richard F. Calichman, the Chair of the Department of Foreign Languages and Literatures, recorded his impression of Chen's first year at CCNY in a memorandum dated June 2, 2008. He noted that Chen was a "committed teacher and scholar" who had done "everything that was asked of her in terms of department service." J.A. 185. Calichman, however, had also "received several faculty complaints regarding what some perceive[d] as her overaggressiveness and lack of tact." *Id.*

These "complaints were voiced primarily in the fall semester," Calichman noted, "suggesting that Prof. Chen has since improved her relations with other faculty in the department." *Id.* Nonetheless, Calichman stated that he would "continue to monitor th[e] situation." *Id.* Chen was reappointed for the 2008-2009 academic year.

This academic year proved to be a fateful one for the Plaintiff-Appellant. Heading into the year, the President of CCNY appointed Chen as the Interim Director of the Asian Studies program. In addition to this role, Chen was scheduled to teach one of two introductory Chinese courses offered by the Department of Foreign Languages and Literatures during the spring. Spring semester began on January 28, 2009. That morning, Chen met a middle-aged male student (the "Student") who had registered for her Chinese course. The Student's "persistent demands for [Chen's] time and attention," in Chen's words, quickly became a problem. J.A. 60.

On that first day of classes, the Student, who had earlier written Chen to express his interest in taking her class, appeared at Chen's office for office hours and stayed there for about two hours until class began. He then attended class and, when the instructional period ended, waited for Chen before leaving the

6

classroom. As Chen left, he followed her out the door, "talking with" her as she went from the classroom back to her office. J.A. 476. The Student engaged in similar behavior on two subsequent class days. Chen found his conduct strange, and she reports that she grew increasingly apprehensive on account of his behavior in these encounters. In an effort to show the Student that he was spending too much time in her office, Chen pointed out that "other people" had been waiting to speak with her "for more than ten minutes or fifteen minutes." J.A. 480. She did not, however, tell him that he made her feel afraid or that she felt he was acting inappropriately.

After these three classes, Chen approached Calichman about the Student, described the situation, and asked that the Student be transferred out of her class. Chen says that Calichman "gave [her] verbal support" and "immediately approved to transfer" the Student to the other introductory Chinese course, effective February 5. J.A. 481. The Student appeared in the Asian Studies office shortly before Chen's scheduled classes on six subsequent days between February 5 and March 5. When he tried to speak with her on at least one occasion, Chen "just [said] hi and then immediately continue[d] to [her]

7

classroom." J.A. 484. These encounters stopped, however, in early March, and Chen thereafter had no contact with the Student for about two months.

At that point, at the end of April, Chen began to focus on class enrollment for the fall semester of 2009. Chen knew that she would be teaching the only upper-level Chinese course in the fall and she asked the other introductory Chinese professor about which students planned to continue with Chinese studies. The professor told her that the Student intended to register for the upper-level course. Concerned about dealing with the Student again, Chen sent Calichman an email explaining the situation. Calichman forwarded her message to John Reynolds, the Dean of CCNY's Humanities Division, who asked Deputy Dean Geraldine Murphy to meet with Chen about the situation. Murphy met with Chen on May 6, 2009 and, after Chen informed her that the Student was neither physically nor sexually threatening, directed Chen to speak with CCNY's Director for Students with Disabilities, Beth Lesen, who "regularly teaches courses on dealing with difficult students." J.A. 219.

The next day, Chen met with Lesen. Chen recalled that Lesen was "understanding and supportive," and provided examples of how Chen could "set up boundaries with the student" if he joined her class — for instance, by

8

informing him that he might "consider finding a tutor" so as to benefit from more individualized instruction than she could provide, or by reserving portions of her office hours for other students. J.A. 501-02. Shortly after the meeting, Lesen sent Chen a follow-up email asking her to "let me know how things go with that student," and assuring her that, "if the situation does not improve after you have created some boundaries . . . I will be able to step in and assist you further. Definitely keep me posted." J.A. 442.

Chen "assumed" that this email was an instruction to meet with the Student immediately.[1] J.A. 325. As a result, she arranged for a meeting between herself, the Student, and the Student's introductory Chinese professor, Chih-ping Ma, on May 13, 2009. At the meeting, Chen presented the Student with a form entitled "Ya-chen Chen's Written Document for [the Student's] Confirmation of Understanding," which read:

> According to Dr. Beth Lesen's opinion, I am writing down the rules for [the Student's] Participation in my CHIN 225 class in fall 2009. Professor Chih-ping Ma is the witness.

---

[1] Chen never testified that Lesen instructed her to immediately meet with the Student during Chen and Lesen's meeting. Instead, Chen's deposition clearly states that Chen assumed such a directive (for an *immediate* meeting) from the follow-up email. Contrary to the assertion in Chen's brief on appeal, moreover, that the "e-mail suggested that Chen 'set up boundaries' *before the end of the semester*,'" Appellant's Br. at 10 (emphasis added), the email includes no such suggestion.

9

> Chinese tutor as the front line for academic questions or learning problems
> Maximum use of my office hours: five to ten minutes every week
> Do not block the doorways of classrooms or offices
> Keep an appropriate distance from professors and classmates
> Class matters should be first brought to the instructor, not administrative heads
> Harmony with classmates and respect for the instructor
> Do not rush the instructor before the class starts
> The instructor reserves the right to take actions against unpredicted or uncomfortable situations

J.A. 193. She requested that the Student sign it. He refused and immediately went to Lesen, expressing hurt and confusion and asking "why [Chen] had never told him that he was doing something she didn't like." J.A. 189.

Chen appeared at Lesen's office later that day with the intention of informing Lesen that the Student had refused to accept the boundaries she set. According to Chen, Lesen reacted by faulting Chen for not "us[ing] stronger words to confront the student." J.A. 509. To demonstrate what Chen should have done, Lesen "yelled very loudly at [her] and asked [her] to repeat a very, very simple English word, stop . . . maybe six or eight times." J.A. 509. Chen also claims that Lesen "indicat[ed] that [the Student] never harassed" her and that everything was in Chen's "imagination." J.A. 335.

Lesen presented a different version of events in an email to Calichman, Murphy, and Reynolds dated two days later. Describing the encounter as "one of the most frustrating meetings I have ever had with a professor," Lesen reported telling Chen "that she should not have sought the student out when he is not currently in any of her classes . . . , may not create any preconditions for registration . . . , [and] must communicate requests and allow students opportunities to change their behavior." J.A. 189. Lesen added that Chen "spent hours (literally) refusing to accept any responsibility for her own actions, asserting that the student had done unacceptable things and should have 'gotten the message' that she was uncomfortable though she never once actually told him." J.A. 189. Lesen also asserted that Chen "showed less than no concern for the student" and also "made clear that she does not have time in her schedule for students who require more attention than she is willing to provide, even if they seek that time during her office hours." *Id.*

After receiving Lesen's email, Calichman scheduled a meeting between himself, Chen, and Murphy to be held on May 20, 2009. Chen says that Calichman did not give her a clear sense of what the meeting would cover, but it soon became clear that Calichman and Murphy wanted to discuss the incident

11

with the Student. Chen reports that both Calichman and Murphy adopted Lesen's view of the situation, blaming Chen for not "stop[ping] the student with clear and stronger words." J.A. 514. Calichman also presented Chen with a memo that, in his view, summarized the meeting. The memo states that he and Murphy advised Chen that it "is inappropriate to intervene with students who are not currently in one's class," "to recruit other professors for help in such intervention," "to present and pressure [students] into signing a contract-like document listing certain conditions that must be satisfied in order for students to enroll in [a] course," and "to conduct what is, in effect, a smear campaign against [a] student[].["[2] J.A. 195. Chen signed this memo to confirm that she had read it and noted that she would write her own summary of the events.

The next day, Calichman again met with Chen to present his evaluation of her performance during the 2008-2009 academic year. As in his evaluation for the 2007-2008 year, Calichman praised Chen's "fine teaching record" and her "productivity as a scholar," noting that Chen received strong teaching reviews, published new scholarship, and presented at several conferences. J.A. 202. But

---

[2] The record is undisputed that in the context of the May 13 incident, Chen contacted other professors requesting information about the Student.

12

"[r]egarding the matter of collegiality," he felt that Chen "still ha[d] considerable room for improvement." *Id.* He explained:

> My remarks in last year's evaluation touched upon her overaggresiveness and lack of tact, as perceived by several of her colleagues. Comments of this nature have continued, despite my attempts to provide guidance throughout the school year . . . . Specifically, several faculty members in Asian Studies have come to my office to complain of her conduct, specifically mentioning that they found Prof. Chen unreasonably defensive and difficult to work with. In addition, a disturbing incident took place earlier this month in which Prof. Chen acted inappropriately toward a student with whom she had problems . . . .

*Id.*[3] The evaluation then described Chen's encounter with the Student, Lesen's report of Chen's "unwillingness to claim responsibility for her inappropriate conduct," and the May 20 meeting between Chen, Calichman, and Murphy. *Id.*

### 2. CCNY's Employment Decisions

The end of the 2008-2009 school year marked the beginning of an uncertain time for Chen. Because her position as Interim Director of the Asian Studies program was a one-year appointment, she would learn over the summer whether she would be offered a second term on the job. Similarly, although

---

[3] As an example of other complaints that Calichman received about Chen, Defendants-Appellees submitted an email from Reynolds to Calichman in which Reynolds wrote that "Chen needs to torque-down a bit[,]" in connection with her role as Interim Director of the Asian Studies program, and that "[s]he hasn't been appointed to the federal bench." J.A. 207. Reynolds expressed concern that Chen was "going to wear out Geraldine [Murphy], who's pretty patient." J.A. 207.

Chen had already been reappointed as an assistant professor for the 2009-2010 school year, the Executive Committee of the Department of Foreign Languages and Literatures was scheduled to reconvene in fall 2009 to determine whether to offer employment to its assistant professors for the 2010-2011 academic year.

On July 7, 2009 — a little more than a month after Calichman's evaluation — CCNY's then-President, Gregory H. Williams, wrote Chen to thank her for her "service . . . as Interim Director of Asian Studies" and to inform her that, "[f]or the coming academic year, a time when long-range strategic planning and hiring will be necessary, I have asked Professor Calichman to take direct charge of the program." J.A. 209. According to Reynolds, both he and Calichman advised against reappointing Chen to another term as Interim Director, but CCNY's President had ultimate authority over the decision.

Following this decision, but before the Executive Committee convened to consider assistant professorships, Chen filed a complaint with CCNY's Office of Affirmative Action (the "Affirmative Action Complaint") and composed several memoranda rebutting Calichman's evaluation and his assessment of the May 20 meeting. In the Affirmative Action Complaint — which she filed on August 25, 2009 — Chen claimed that Lesen committed "racial/linguistic discrimination" by

14

"ask[ing] [Chen] to read the word, 'stop,' after her for 6-8 times in a racially and linguistically discriminatory tone." J.A. 213. Chen also averred that Calichman and Murphy denied her "equal treatment in employment" because she was a "non-white, junior and foreign woman," and retaliated against her because she complained about the Student. J.A. 211. According to the Complaint, Calichman and Murphy should have referred her to the Affirmative Action office, not Lesen, because the Student had sexually harassed her and Lesen is not qualified to handle such harassment. Chen also stated that Calichman and Murphy negatively affected her career by criticizing how she handled the situation.

Chen's memoranda rebutting Calichman's evaluation and his assessment of the May 20 meeting reiterated these allegations, highlighted instances of Chen's collegiality, and defended her conduct vis-à-vis the Student. In Chen's view, Lesen told her to confront the Student right away and later contradicted herself by criticizing Chen's actions. The Student, Chen claims, "should have thanked" her for presenting him with written rules of behavior. J.A. 436.

On October 15, 2009, the Executive Committee of the Department of Foreign Languages and Literatures convened to determine whether to reappoint assistant professors in the Department for the 2010-2011 school year. The group

15

consisted of five voting members. Calichman was among the voting members, and he advocated against Chen's reappointment. Ultimately, the Executive Committee sided with Calichman, with three votes against reappointment and two abstentions. The Committee informed Chen of its decision in a letter on October 20, 2009.[4] Several days later, the Affirmative Action Office informed Chen that it had investigated her Complaint and determined that the Student had not sexually harassed her or "threaten[ed] her with any type of violence" and that her evaluation was consistent with the prior year and "gave a fair and accurate representation of her performance, including her triumphs and shortcomings." J.A. 220-21. The Affirmative Action Office found no wrongdoing.

Once informed of the Executive Committee's decision that she would not be reappointed for the 2010-2011 school year, Chen filed an appeal with the Humanities Division's Personnel and Budgetary Committee. Chen submitted documents on her behalf — including letters of support from faculty members — and Calichman testified against Chen's candidacy. The chair of the Committee recalled receiving this information, as well as having direct discussions with

---

[4] The Executive Committee reappointed the seven other assistant professors that it discussed at the October 15 meeting. Two of those assistant professors — Carlos Riobo and Vanessa Valdes — started at the same time as Chen.

Chen. J.A. 572. The Personnel and Budgetary Committee denied Chen's appeal on November 3, 2009, by a vote of six against and one abstention. Chen then pressed her appeal before a CCNY Review Committee, which voted unanimously against her reappointment. When asked if he could remember anything about the decision, the chair of the Review Committee noted that it "had to do with her . . . inappropriate conduct, erratic behavior." J.A. 580.

Finally, Chen sought relief from CCNY's President, Robert Paaswell. Paaswell reviewed the documents Chen submitted, spoke with Calichman, Lesen, and Murphy, and decided to deny Chen's appeal. In a letter to Chen, Paaswell "recognize[d] that [Chen's] teaching ha[d] been positively evaluated by [her] peers and [her] students," that her work as a scholar had been "commendable," and that she had "provided valuable service to the College." J.A. 169. He concluded, however, that Chen's "conduct in connection with an incident that occurred during the Spring 2009 semester with a student displayed seriously poor judgment," and that her subsequent memos about the situation "demonstrate[d] that [she] failed to recognize the inappropriateness of [her] conduct." J.A. 169. In Paaswell's judgment, this conduct demonstrated Chen's failure "to satisfy the mandate of [Bylaw] Section 11.7.B.2," which requires

17

assistant professors to demonstrate "satisfactory qualities of personality and character." J.A. 170.

## B. Procedural History

Chen filed a complaint with the New York State Division of Human Rights, claiming that CCNY took adverse employment action against her because of her national origin, race, and sex, and because of her complaints about the Student and several employees. When the agency dismissed her claims, she promptly brought suit against CUNY and four of its employees — Calichman, Lesen, Murphy, and Paaswell (the "Individual Defendants") — in the United States District Court for the Southern District of New York (Abrams, *J.*) claiming, *inter alia*, that CUNY violated Title VII and that the Individual Defendants infringed on rights protected by the Equal Protection Clause of the Fourteenth Amendment and by the NYCHRL.[5] In particular, Chen alleged that the decisions not to reappoint her as Interim Director of the Asian Studies program or as an assistant professor — along with the negative comments made by the Individual Defendants — were motivated by discrimination on the basis of her race,

_____

[5] Chen filed an initial complaint before Judge McMahon, who dismissed several claims and gave Chen leave to file an amended complaint. Judge Abrams took charge of the case after this initial decision.

18

national origin, and gender, and by the desire to retaliate against her for filing an Affirmative Action Complaint.

Following discovery, the defendants filed a joint motion for summary judgment, which the district court granted on March 31, 2014. On the federal discrimination claims against CUNY and the Individual Defendants, the court assumed, without deciding, that Chen established a prima facie case of discrimination on the basis of gender, race, and national origin. Even with that assumption, the court concluded that Chen had failed to raise a genuine dispute of material fact about whether CUNY's employment decisions or the Individual Defendants' actions were motivated by discrimination. In particular, the court noted that the record contained "overwhelming evidence" that Chen lost her Interim Director position and her assistant professorship because of the way she handled the situation with the Student and because of her interactions with her colleagues. S.P.A. 13-14.

As for the federal retaliation claim against CUNY, the court again assumed that Chen could establish a prima facie case of retaliation, but concluded that CUNY "articulated legitimate, non-retaliatory reasons for not renewing Chen's appointments" and that Chen could not show that those reasons were a pretext

19

for retaliatory animus. S.P.A. 18. The court observed that the employment decisions were "entirely consistent as a progressive response to Chen's disturbing incident with the Student" and that her "reappointment had been called into question long before she filed the affirmative action complaint." S.P.A. 19. In light of these facts, the mere temporal proximity of her complaint to the employment decisions was not sufficient to raise a genuine dispute of material fact about CUNY's alleged retaliatory motive. The court therefore granted summary judgment for defendants on all of Chen's claims.[6] This appeal followed.

## DISCUSSION

We review the "district court's decision to grant summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)). Summary judgment is appropriate only when "the movant shows that

---

[6] The district court addressed Chen's discrimination and retaliation claims under the NYCHRL separately from her federal claims, but granted the Individual Defendants summary judgment on them for the same reasons. It also granted summary judgment on Chen's claims that the Individual Defendants aided and abetted CUNY's Title VII violation.

20

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. Federal Claims

Chen's primary argument on appeal is that the district court erred by granting summary judgment on her claim that CUNY retaliated against her for filing an Affirmative Action Complaint, in violation of Title VII. She also contends that the court was wrong to grant summary judgment on her discrimination claims against CUNY under Title VII and against the Individual Defendants under the Equal Protection Clause. We address each issue in turn.

### 1. Retaliation

Title VII prohibits employers from retaliating "against any . . . employee[] . . . because [that individual] has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). We analyze retaliation claims using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she "participated in a protected activity," "suffered an adverse employment action," and "that there was a causal connection between her engaging in the protected activity and the adverse

21

employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). This showing creates a "presumption of retaliation," which the defendant may rebut by "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such an explanation, "the presumption of retaliation dissipates," *id.*, and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

The district court assumed, without deciding, that Chen established a prima facie claim of retaliation. CUNY, however, offered a legitimate rationale for its decisions against reappointing her as either Interim Director of the Asian Studies program or as an assistant professor: she demonstrated "overaggressiveness and [a] lack of tact," both with her colleagues and in the incident with the Student. J.A. 202. Chen argues that this explanation is a pretext for retaliation. In brief, she contends that the timing of the employment decision, her reliance on Lesen's instructions, and the positive portions of her reviews show that CUNY was led by Calichman to turn an isolated issue with a student into a severe adverse employment decision as punishment for filing an

22

Affirmative Action Complaint.[7] We disagree and conclude that the district court correctly decided that Chen failed to raise a genuine dispute of material fact about whether CUNY retaliated against her because of her Complaint.

Significantly, it is undisputed that members of the Department of Foreign Languages and Literatures took issue with Chen's collegiality long before she filed her Affirmative Action Complaint. Calichman wrote that in fall 2007 — Chen's very first semester at CCNY — he "received several faculty complaints regarding what some perceive as her overaggressiveness and lack of tact," and that he felt it necessary to "continue to monitor th[e] situation." J.A. 185. The 2008-2009 school year then brought the incident with the Student. Initially, Calichman was sympathetic to Chen's situation, transferring the Student out of her class, while Lesen and Murphy provided assistance in developing strategies for dealing with the Student if he joined Chen's upper-level course. Once they learned about the way that Chen confronted the Student, however, their attitude

---

[7] Although several different committees considered Chen's reappointment, Calichman's evaluation played a significant role at every step of the process. As a result, Chen can succeed in her claim against CUNY if she shows that Calichman was motivated by unlawful considerations. *See Holcomb v. Iona Coll.* 521 F.3d 130, 143 (2d Cir. 2008) ("[A] Title VII plaintiff is entitled to succeed, 'even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process.'" (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (alteration in original)).

changed. A frustrated Lesen wrote to Calichman and Murphy that she had been "very clear that the student must not be hindered from registering for the course . . . and [that] [Chen] must verbally communicate any problems she has to the student when they're actually happening." J.A. 188. Chen, according to Lesen, not only ignored these instructions, but also "spent hours (literally) refusing to accept any responsibility for her own actions." J.A. 189. Murphy and Calichman agreed with Lesen's view of the events and expressed their concern with Chen's actions in the May 20 meeting. Calichman then reiterated these concerns in his evaluation, describing the incident with the Student as "disturbing" and noting that comments from faculty about Chen's "overaggressiveness and lack of tact" had continued. J.A. 202. These negative evaluations contributed to CUNY's decision not to offer Chen a second term as Interim Director of the Asian Studies program — a decision that was made *before* Chen filed her Affirmative Action Complaint.[8]

Not only did Lesen, Calichman, and Murphy develop these opinions about Chen's conduct *before* she filed her Affirmative Action Complaint, they also maintained a consistent perspective afterwards. *See Weinstock v. Columbia Univ.*,

---

[8] Because CUNY made its decision regarding Chen's position as Interim Director of the Asian Studies program before her Complaint, no reasonable jury could conclude that its decision was motivated by a desire to retaliate against her for that grievance.

24

224 F.3d 33, 45 (2d Cir. 2000) (noting that the "consistency of the viewpoint expressed" supports the "proffered nondiscriminatory reason" for the employment action). For instance, in interviews with the Affirmative Action office, Calichman stated that Chen was "extremely resistant" to the idea that she handled the situation with the Student incorrectly, and Murphy described the May 20 meeting as "like pulling teeth." J.A. 414-15. Similarly, although the record does not describe what Calichman said when he advocated against Chen's reappointment, the chair of the Review Committee recalled that the central issue on Chen's appeal was her "inappropriate conduct." J.A. 580. Paaswell also wrote that, after speaking with Lesen, Calichman, and Murphy, he decided against reinstating Chen as an assistant professor because her conduct with the Student "displayed seriously poor judgment," and her subsequent handling of the situation "demonstrate[d] that [she] failed to recognize the inappropriateness of [her] conduct." J.A. 169.

In light of this background, Chen's argument that she handled the Student "precisely as Lesen directed," Appellant's Br. at 33-34, is beside the point — at least in regards to adducing evidence on which a reasonable jury could find that Chen was the victim of retaliation. Even if Calichman, Murphy, and Lesen

reacted ill-advisedly to Chen's conduct somehow — faulting her for doing what Lesen had counseled — they arrived at their opinions that Chen had behaved improperly *long before Chen filed her Affirmative Action Complaint*. Thus, no reasonable jury could conclude that their views of the situation were motivated by retaliatory animus arising from Chen's Affirmative Action Complaint. [9] Moreover, Calichman's evaluation of Chen's collegiality went beyond her interactions with the Student, noting complaints from other faculty members

---

[9] Granted, the decision not to reappoint Chen as Director of Asian Studies (and any deliberations or correspondence thereabouts) occurred *after* Chen initially complained about the Student, albeit *before* the filing of the Affirmative Action complaint. Nevertheless, no reasonable jury could infer pretext from this temporal proximity. *Cf. El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("[T]emporal proximity . . . is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."). Chen produces no testimony or evidence suggesting that any of the Defendants arrived at their opinions to recommend against reappointment until *after* Chen's confrontation with the Student. Indeed, the record makes clear that, prior to this confrontation, insofar as any of the Defendants reacted to Chen's complaints, it was with support: Chen herself acknowledges that when she first requested that the Student be moved from her class, on February 4, Calichman "gave [her] verbal support" and "immediately approved [the transfer]." J.A. 481. It was not until after the May 13 incident and the May 20 meeting with Calichman and Murphy in which both expressed clear disapproval of Chen's handling of that incident that Calichman recommended Chen not be reappointed and Reynolds passed on that recommendation to the provost. Thus, no reasonable jury could find that retaliatory animus as a result of Chen's *complaints* about the Student, rather than disapproval of Chen's handling of the situation, motivated the Defendants to recommend against reappointment.

26

about how Chen handled disagreements in Chen's very first year of employment.

Perhaps recognizing these issues, Chen counters that allegations of her "overaggressiveness and lack of tact," even if true, would not have caused CUNY to deny her reappointment were it not for her Affirmative Action Complaint. In support, she cites the timing of her Complaint in relation to the employment decision and the positive elements of her evaluations. But this evidence, in context, does not support the inference that Chen suggests. We have long held that "temporal proximity" between a protected complaint and an adverse employment action "is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext," *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam), and the inference is particularly weak in this case. The executive committee of every department at CCNY conducts annual reviews of assistant professors, and the Executive Committee of the Department of Foreign Languages and Literatures evaluated Chen's candidacy at the same time as it reviewed the other assistant professors in the Department. As a result, the timing of its decision about Chen's reappointment cannot, under these circumstances, plausibly support an inference that Chen would have been

27

reappointed had she not filed her Affirmative Action Complaint. CCNY's annual review process, by its nature, must take into account the types of collegiality and student interaction concerns that Calichman's evaluation raised; these concerns would thus have come up at Chen's review regardless of her protected activities.

Nor do the positive aspects of Chen's evaluations, without more, support the inference that CUNY's reappointment decision was a disproportionate response to the information it received about her conduct, much less that this decision was retaliatory. Chen's positives are impressive: both Calichman and Paaswell stated that she was a "fine teach[er]," a "productive[e] . . . scholar," and provided "valuable" service to CCNY. J.A. 202; *see also* J.A. 169. But as CCNY's Bylaws make clear, reappointment decisions also involve considering whether the candidate demonstrates "satisfactory qualities of personality and character . . . and [a] willingness to cooperate with others for the good of the institution."[10] J.A. 166. Chen has presented no evidence of how CCNY treated assistant professors who were subject to comparable allegations of inappropriate conduct

---

[10] Chen's unsupported argument that CUNY does not typically consider "qualities of personality and character" when making reappointment decisions is belied by the record. CCNY's Bylaws explicitly direct evaluators to consider such factors, and members of both the Personnel and Budget Committee and the Review Committee testified that their considerations are not limited to teaching, scholarship, and service.

28

with a student or of a lack of collegiality.[11]  Without such comparators — or *some other* evidence suggesting that the college acted on retaliatory motives — no reasonable jury could decide that CUNY's decision to prioritize the complaints against Chen over her professional achievements evinces such motives.  *See, e.g.*, *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  After all, "universities are free to establish departmental priorities . . . and to act upon the good faith judgments of their departmental faculties or reviewing authorities," *Zahorik v. Cornell Univ.*, 729 F.2d 85, 94 (2d Cir. 1984), and Title VII is not an invitation for courts to "sit as a super-personnel department that reexamines" employers' judgments, *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (per curiam) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)).

In sum, the district court was correct that, assuming Chen established a prima facie case of retaliation, CUNY offered a non-retaliatory explanation for its reappointment decision and Chen failed to present sufficient evidence from which a reasonable jury could conclude "that the desire to retaliate was the but-

---

[11] Chen argues that two assistant professors who began teaching in 2007 — Carlos Riobo and Vanessa Valdes — were reappointed notwithstanding less significant scholarly achievements and service to the university.  She has not, however, presented any admissible evidence showing that either professor was subject to, or should have been subject to, similar complaints about collegiality or interactions with students.

for cause" of CUNY's action. *Nassar*, 133 S. Ct. at 2528. Accordingly, we affirm the court's decision to grant CUNY summary judgment on Chen's Title VII retaliation claim.

**2. Discrimination Claims**

Chen also argues that the district court was wrong to grant summary judgment on her claims that CUNY violated Title VII by discriminating against her on the basis of her race, national origin, and gender, and that the Individual Defendants violated the Equal Protection Clause for the same reason. In brief, she avers that Calichman, Lesen, and Murphy expressed negative opinions about how Chen handled the situation with the Student as a pretext for discrimination. Because Calichman relayed these views, along with other comments about Chen's "overaggressiveness and lack of tact," J.A. 202, to the committees and individuals responsible for the decision not to reappoint Chen as Interim Director of the Asian Studies program and as an assistant professor, including Paaswell, their discrimination tainted CUNY's ultimate decisions.

As with the retaliation charge, we evaluate Chen's Title VII and Equal Protection claims under the *McDonnell Douglas* framework. Assuming that Chen established a prima facie case of discrimination, we conclude that, in light of

30

Calichman, Lesen, and Murphy's stated basis for their opinions, Chen has failed to "show circumstances that would be sufficient to permit a rational finder of fact to infer that" either their views or CUNY's employment decisions were "more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

At bottom, Chen's discrimination claims revolve around the argument that she followed Lesen's instructions about setting boundaries with the Student, so Calichman, Lesen, and Murphy must have had discriminatory motives for reacting as they did. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (permitting the factfinder "to consider [the defendant's] *dishonesty* about a material fact" (emphasis added)). Chen's testimony, however, reveals nothing more than a difference of opinion about her actions. Calichman's memo after the May 20 meeting described what he, Lesen, and Murphy saw as problematic aspects of Chen's conduct, pointing out that she should not have "pressure[d] [the Student] into signing a contract-like document," "intervene[d]" with a student who was not in her class, "recruit[ed] other professors" to help her, or established a barrier to "enroll[ing] in [her] course." J.A. 195. There is no

31

evidence that Lesen instructed Chen to handle the situation with the Student in this manner. Indeed, when asked to describe Lesen's instructions in a deposition, Chen made no mention of Lesen allowing restrictions on enrollment and stated that Lesen described only verbal ways to set boundaries and told her to "confront the student by [her]self." Chen noted that she simply "assumed" Lesen wanted her to meet with the Student immediately — an assumption she arrived at not on the basis of a specific statement during the conversation, but from Lesen's suggestion in a follow-up e-mail that Chen "[d]efinitely keep [her] posted." J.A. 324-27, 442. We take no position as to whether Chen handled the matter improperly, and indeed, we do not question the sincerity of Chen's belief that she faced a difficult situation and handled it appropriately. Nonetheless, we cannot conclude that a reasonable jury could find that Chen's colleagues were *insincere* in their own belief that, even if the Student's behavior was odd or improper, Chen's handling of the situation demonstrated exceedingly poor judgment. *See Reeves*, 530 U.S. at 147-48; *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) ("[P]laintiff must prove that a defendant's proffered reasons were not the true reasons for its actions but a pretext for discrimination."). As a result, Chen's evidence about Lesen's instructions does

not support the inference that Calichman, Lesen, Murphy, or CUNY discriminated against her on the basis of her race, national origin, or gender.

Similarly, none of the other circumstances surrounding the reappointment decisions warrants an inference of discrimination. Chen may be correct that, in certain contexts, vague words like "collegiality" can serve as a mask for discrimination. But in light of Calichman's rationale for his review of Chen's collegiality and the fact that CCNY's Bylaws require assistant professors to demonstrate "satisfactory qualities of personality and character," J.A. 170, it is "simply not objectively reasonable to label" the word collegiality as a "semaphore[] for discrimination." *Weinstock*, 224 F.3d at 44-45. By the same token, Chen's testimony as to Lesen's repeated use of the word "stop" in her second meeting with Chen — a meeting which focused on explaining how Chen should have confronted the student — is not enough, standing alone, to support an inference of discriminatory motivations. Quite simply, even if sincerely held, a plaintiff's "feelings and perceptions of being discriminated against" do not provide a basis on which a reasonable jury can ground a verdict. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (brackets omitted).[12]

---

[12] Chen also claims that Calichman informed her he would not consider her Chinese-language publications when setting her salary, and that he did not allow her to take

Given the absence of evidence giving rise to an inference of discrimination, we agree with the district court's decision that no reasonable jury could conclude that CUNY and the Individual Defendants were motivated, in whole or in part, by a desire to discriminate on the basis of Chen's race, national origin, or gender. Indeed, as the district court concluded, there is simply "no evidence in the record that Defendants' failure to renew Chen's Directorship or appointment as Professor for the 2010-2011 academic year had anything to do with Chen's gender, race, or national origin."  S.P.A. 13.  We therefore affirm the district court's decision to grant summary judgment to CUNY on both of Chen's Title VII claims, and to the Individual Defendants on Chen's Equal Protection claim.

**B. New York City Human Rights Law**

In addition to her federal claims, Chen also argues that Calichman, Lesen, Murphy, and Paaswell violated the NYCHRL because they discriminated against her on the basis of race, national origin, and gender, and because they retaliated against her for filing an Affirmative Action Complaint.  Based on the evidence in the record, no reasonable jury could agree with Chen's claims.

---

advantage of a course release.  She has failed, however, to identify any publications that Calichman did not consider, to connect these allegations to the relevant employment decisions, or to provide any admissible evidence of how other similarly situated professors were treated.  These assertions are therefore insufficient to create a genuine issue of material fact for trial.

"[F]or many years, the NYCHRL was construed to be coextensive with its federal and state counterparts." *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015) (per curiam). But in 2005, the New York City Council amended the law to emphasize that "interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall" and that the NYCHRL should "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Local Civil Rights Restoration Act of 2005, § 7, N.Y.C. Local L. No. 85). In light of these revisions "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Id.* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011) (internal citations omitted).

New York courts seeking to heed the City Council's command have approached discrimination and retaliation claims under a similar framework. In both situations, the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions. *See Bennett v.*

35

*Health Mgmt. Sys.*, 936 N.Y.S.2d 112, 124 (1st Dep't 2011). If the defendant

satisfies that burden, summary judgment is appropriate if no reasonable jury

could conclude either that the defendant's "reasons were pretextual," *Melman v.*

*Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35 (1st Dep't 2012), or that the defendant's

stated reasons were not its sole basis for taking action, and that its conduct was

based at least "in part on discrimination," *id.* at 41 (quoting *Aulicino v. New York*

*City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009)). In other words,

summary judgment is appropriate if "the record establishes as a matter of law"

that discrimination or retaliation "play[ed] *no* role" in the defendant's actions.

*Mihalik*, 715 F.3d at 110 n.8 (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120,

127 (2d Cir. 2013)); *see also Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40

n.27 (1st Dep't 2009).[13]

Viewed through this lens, we agree with the district court's decision that

Chen has not presented evidence from which a reasonable jury could conclude

---

[13] We note that, at least in the discrimination context, this inquiry closely mirrors the questions that courts must answer when resolving summary judgment motions on Title VII claims. After all, once a Title VII claimant raises a prima facie case of discrimination and the employer offers a legitimate explanation, the court considers whether a reasonable jury could conclude that the employer's decision was motivated, in whole or in part, by discrimination. The plaintiff can survive summary judgment by showing that "the employer's stated reason for the adverse employment action is entirely pretextual," or that the employer had "mixed motives," one of which was the desire to discriminate. *See Holcomb*, 521 F.3d at 141-42.

that discrimination on the basis of race, national origin, or gender played a role in the Individual Defendants' actions. As explained above, Calichman, Lesen, and Murphy provided a legitimate reason for expressing negative opinions about Chen's conduct. Chen has failed to raise a genuine dispute about whether those "complaints . . . were made in good faith." *Melman*, 946 N.Y.S.2d at 36. Even under the NYCHRL, "[t]he mere fact that [a] plaintiff may disagree . . . [and] think that [her] behavior was justified does not raise an inference of pretext." *Id.* (quoting *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312 (2004) (brackets omitted). Nor do Calichman's reference to "collegiality" or Lesen's use of the word "stop" sufficiently support Chen's claim; no reasonable jury could conclude, in context, that either evinced discriminatory intent.

Turning to Chen's retaliation claim, we note that NYCHRL's retaliation provision is broader than Title VII's — protecting plaintiffs who "oppos[e] any practice forbidden under" the law from conduct "reasonably likely to deter a person engaging in such action." *Mihalik*, 715 F.3d at 112; *see also* N.Y.C. Admin. Code § 8-107(7). Chen's NYCHRL claim, however, still relies principally on the idea that she was retaliated against because of her Affirmative Action Complaint; she has not identified any earlier time when she "opposed any practice forbidden

37

under" the NYCHRL. Thus, she must show that Calichman, Lesen, Murphy, and Paaswell engaged in some prohibited conduct and that their decision to do so was "caused at least in part by . . . retaliatory motives." *Id.* at 113; *see also Brightman v. Prison Health Serv.*, 970 N.Y.S.2d 789, 789 (2d Dep't 2013).

Chen's retaliation claim fails even under this broader provision. To begin, there is simply no evidence that Lesen or Murphy engaged in any conduct "reasonably likely to deter a person" from complaining about NYCHRL violations after Chen filed her Affirmative Action Complaint. *See Melman*, 946 N.Y.S.2d at 42 (noting that a defendant cannot "be deemed to have retaliated against plaintiff simply by denying that it was discriminating against him and confronting him with [his] professional lapses"). Nor has Chen presented facts from which a reasonable jury could conclude that Calichman's advocacy against Chen's reappointment or Paaswell's rejection of her appeal were motivated, in part, by retaliation. As explained above, Calichman took note of comments about Chen's "overaggressiveness and lack of tact" in her first year of teaching and, in his view, her confrontation with the Student and handling of the aftermath confirmed those concerns. Calichman expressed those opinions in a professional evaluation long before Chen's Affirmative Action complaint and

reiterated the concerns when advocating against Chen's reappointment. *Cf. Mihalik*, 715 F.3d at 116 (denying summary judgment when defendant "presented no evidence that anyone confronted [plaintiff] about [performance] problems" until plaintiff complained). Under these circumstances, the fact that Chen's reappointment decision came soon after her Affirmative Action complaint is insufficient to support a claim of retaliatory discharge: Chen was reviewed along with all other assistant professors and, in light of CCNY's review system, Calichman had no earlier opportunity to voice his opinion on Chen's reappointment. *See Suriel v. Dominican Rep. Educ. & Mentoring Proj., Inc.*, 926 N.Y.S.2d 198, 202 (3d Dep't 2011). Chen has also presented no evidence that Paaswell's decision was based on anything other than considering her record in light of his discussions with Calichman and other faculty members. Accordingly, the district court was therefore correct to grant all of the defendants summary judgment on Chen's retaliation claim.

In sum, after conducting a separate analysis for Chen's NYCHRL claims, we conclude that the district court's decision granting summary judgment to the Individual Defendants was correct. We therefore affirm its decision.[14]

---

[14] Because we conclude that Chen has failed to present sufficient evidence from which a jury could conclude that CUNY violated Title VII or that the Individual Defendants

## CONCLUSION

We have considered Chen's remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

violated the Equal Protection Clause or the NYCHRL, we also agree with the district court's decision to grant summary judgment on her aiding and abetting claims.

DENNY CHIN, *Circuit Judge*, concurring in part and dissenting in part:

I concur in the majority's holding that the district court properly granted summary judgment dismissing plaintiff-appellant Ya-Chen Chen's Title VII discrimination claims. I respectfully dissent, however, from the majority's affirmance of the district court's dismissal of Chen's retaliation claims under Title VII and her claims for discrimination and retaliation under the New York City Human Rights Law (the "NYCHRL"). In my view, the record contains sufficient evidence to permit a reasonable jury to find that: 1) with respect to her Title VII claims, Chen was fired because of her complaints of discrimination; and 2) under the NYCHRL's more lenient standard, Chen was treated less well because of her race or gender and because of her complaints of discrimination.

Chen, an Asian woman, was employed as an Assistant Professor at the City College of New York ("CCNY") starting in September 2007. She had generally positive reviews, was appointed Interim Director of the Asian Studies Program at the start of her second year, and was reappointed as a tenure-track Assistant Professor for the 2008-2009 and 2009-2010 academic years. Yet, after she complained about receiving too much attention from a fifty-four-year-old male student (the "Student") and then complained of what she believed to be

discrimination, she was dismissed as Interim Director of the Asian Studies Program, denied reappointment to a tenure-track professorship, and then fired. A reasonable jury could find that these adverse actions were retaliatory.

Accordingly, I would vacate the judgment of the district court with respect to Chen's retaliation claims under Title VII and her retaliation and discrimination claims under the NYCHRL and remand for further proceedings.

**I**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Such unlawful discrimination occurs where an employer takes an "adverse action[]" against an employee, meaning any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). We have observed that such adverse actions often arise when "an employee whose primary claim of discrimination cannot survive pre-trial

42

dispositive motions is able to take to trial the secondary claim that he or she was fired or adversely affected in retaliation for asserting the primary claim." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 762 (2d Cir. 1998); *see Alvarez v. City of New York*, 31 F. Supp. 2d 334, 344 (S.D.N.Y. 1998) ("All too often . . . employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case.").

To prove retaliation, a plaintiff must show that 1) her employer discriminated or took an adverse employment action against her 2) "because" she opposed an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "'[B]ut-for' causation does not[, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Thus, there may be multiple but-for causes, and "[t]he determination of whether retaliation was a 'but-for' cause . . . is particularly poorly suited to disposition by summary judgment, because it

requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Id.* at 846 n.5.

In my view, the district court erred in granting summary judgment dismissing Chen's Title VII retaliation claims for three reasons: 1) the district court engaged in improper fact-finding; 2) there are genuine issues of material fact to be resolved by a jury; and 3) there is sufficient evidence in the record to permit a reasonable jury to find retaliation.

## A

First, the district court erred by drawing factual conclusions at the summary judgment stage rather than simply determining whether genuine issues of material fact existed for trial.

The district court found that Chen failed to handle the incident involving the Student according to Lesen's instructions, but the record contained conflicting evidence in this respect. Chen contends that Lesen instructed her to confront the Student and set up boundaries even though he was not then enrolled in her class, and that Lesen suggested that Chen do so immediately, that is, before the end of the semester. In contrast, Lesen denies that she suggested that Chen should interact with the Student before the end of the semester and

44

contends specifically that she told Chen "not to deal with these behaviors before they actually occurred." *Ya-Chen Chen v. City Univ. of New York*, No. 11 Civ. 0320(RA), 2014 WL 1285595, at *2 (S.D.N.Y. Mar. 31, 2014) (internal quotation marks omitted). Rather than viewing the record in the light most favorable to Chen, *see Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012), the district court stated that it "shares Defendants' view" that Chen's handling of the incident was "disturbing" and "inappropriate," *Chen*, 2014 WL 1285595, at *8. Indeed, the district court resolved the factual dispute in favor of defendants, finding, for example, that "there is no evidence that Lesen instructed Chen to . . . speak to the Student immediately," *id.*, when there was such evidence: Chen's recollection of the meeting and Lesen's e-mail following the meeting, which can be reasonably construed as contemplating immediate action, *see id.* at *2.

As the majority observes, the district court also found that "[d]efendants' actions, contrary to constituting evidence of retaliation for Chen's complaints, are *entirely consistent* as a progressive response to Chen's 'disturbing incident' with the Student." *Id.* at *11 (emphasis added); *see* Maj. Op. at 20-21. By finding these actions "entirely consistent" with the notion of progressive discipline, and by finding that non-retaliatory reasons existed for defendants' decisions, the district

45

court made a factual finding that should have been reserved for the jury. Of course, while the actions might have been "entirely consistent" with the concept of progressive discipline, they also could have been found by a reasonable jury to be retaliatory.

**B**

Second, genuine issues of fact remain that should be resolved by a jury.

First, many of the facts relating to the incident involving the Student are disputed. As discussed above, whether Chen handled the meeting with the Student in accordance with Lesen's instructions is a factual question for the jury. Similarly, factual questions remain as to whether there was a sexual undertone to the incident and whether Chen described it as a sexual incident. Chen complained that the Student harassed her by blocking the doorway, spending long periods of time in her office hours, and would move closer and closer to her when speaking to her. Chen used words like "worried, afraid, strange," when complaining about the incident and noted that a male colleague did not experience the same interactions with the Student. App. at 329.

Second, factual questions remain regarding defendants' treatment of Chen after the incident. Chen's complaint alleges that Lesen "raised the volume of her

voice and discriminated against me by requesting me to read the word, 'stop,' after her at least six to eight times as if I were only a child." App. at 211. Chen alleged -- and a reasonable jury could find -- that this conduct was "racially and linguistically discriminatory" and made her feel like "a foreign fool or a kindergarten child." App. at 213, 333. Chen also complained that her May 20, 2009 meeting with Calichman and Murphy was inappropriate, and testified that the meeting highlighted "very, very strong cultural differences." App. at 525.

Third, a factual question exists as to whether the reappointment process was tainted. Calichman was present and voted at the October 15, 2009 executive committee meeting to reappoint professors. He had been named in Chen's Affirmative Action complaint, and thus there is a question as to whether his involvement unduly influenced the decision.

These and other disputed factual questions are all relevant to a determination of whether retaliation was a cause of Chen's adverse treatment, and accordingly should be considered by a jury.

Third, there is evidence in the record from which a reasonable jury could find retaliation, including the temporal proximity of events, Chen's mostly positive evaluations, concerns about the reappointment process, the disproportionate nature of Chen's punishment, and defendants' shifting explanations for her dismissal.

First, the timeline of events supports the notion that defendants acted with a retaliatory motive. The incident occurred on May 13, 2009. Chen met with Calichman and Murphy seven days later to discuss the incident. A mere eighteen days later, Calichman recommended that Chen be removed as Director of the Asian Studies Program, and she was replaced as Director. On August 25, 2009, Chen filed a complaint with CCNY's Affirmative Action Office. Within two months of filing, on October 20, 2009, defendants voted not to reappoint Chen. On November 4, 2009, Chen filed a complaint with the New York State Division of Human Rights. Within a couple weeks, on November 19, 2009, Chen was notified that her position would be permanently terminated.

The majority contends that because Lesen, Calichman, and Murphy developed their "opinions about Chen's conduct" before she filed her complaint

48

with the Affirmative Action Office, "[n]o reasonable jury could conclude that their views of the situation were motivated by retaliatory animus." Maj. Op. at 24-27. This reading of the facts, however, gives undue weight to defendants' initial reactions to the incident, ignoring the escalation of both Chen's complaints and defendants' actions against her. While defendants removed Chen as Director of the Asian Studies Program before she filed with the Affirmative Action Office, this occurred after she had already complained to Calichman and Murphy about the incident. Further, the decision to not reappoint her came *after* the Affirmative Action Office filing. Accordingly, the timeline of events supports an inference that Chen was dismissed for complaining about the incident and then complaining of discrimination against her.

Second, Chen's demonstrated history of positive performance evaluations supports an inference of retaliation. Chen's June 2, 2008 evaluation recognized her strengths and noted that her overall relations with others had improved. The evaluation noted: "Chen is an excellent teacher"; "[s]he also received a colleague evaluation of 'Good' and 'Excellent'"; and "Chen is a committed teacher and scholar." App. at 185. The only negative comment in this review referenced "what some perceive as her overaggressiveness and lack of tact." *Id.* Even the

review Chen received after the incident highlighted her achievements, including that she received "two colleague evaluations of 'Very Good' and 'Excellent,'" secured a book contract, wrote several articles, and delivered several conference presentations. *Id.* at 202. It also observed that her "productivity as a scholar is commendable," and she provided valuable services to the Asian Studies Program. *Id.* Again, in her three years at CCNY, Chen was promoted to Interim Director of the Asian Studies Program and was twice reappointed to a tenure-track professorship. *See Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 874, 879-81 (2d Cir. 1997) (citing history of positive performance evaluations as supporting plaintiff's discrimination claims). Chen's handling of the incident, even assuming she mishandled it, must be viewed in the context of her overall record.

Third, Chen presented evidence that Calichman tainted the reappointment process, further supporting her retaliation claim. Calichman was aware that he was a subject of Chen's Affirmative Action complaint and actively advocated against Chen and ultimately voted against her reappointment. Moreover, the other seven professors up for reappointment that year were reappointed *unanimously*. Yet Chen did not receive a single favorable vote: two members of

the committee abstained and three voted against reappointment. A reasonable jury could infer an intent to punish.

Fourth, the disproportionate nature of Chen's punishment supports a finding of retaliation. *See Nembhard v. Mem'l Sloan-Kettering Cancer Ctr.*, 918 F. Supp. 784 (S.D.N.Y. 1996), *aff'd*, 104 F.3d 353 (2d Cir. 1996) (holding that harsh punishment coupled with positive employment record supports finding of pretext). Chen served as a tenure-track assistant professor from 2007 until 2010 and was reappointed twice during that time. As recognized by Paaswell, Chen was generally well-regarded, her "productivity as a scholar ha[d] been 'commendable,'" and she provided valuable service to the college, including serving on the Department Curriculum Committee, managing the Department website, offering two independent studies courses, and grading Chinese language placement exams. App. at 169. Paaswell also acknowledged that Chen had been "positively evaluated" by her peers and students. *Id.* Murphy echoed Paaswell's recognition of Chen's positive impact and even testified that he was surprised when Chen was removed as the Director of the Asian Studies Program. In light of this record, a reasonable jury could surely infer a retaliatory motive

from the failure of defendants to impose a punishment less severe than termination.

Fifth, defendants' shifting explanations for Chen's termination support a finding of retaliation. *See Zann Kwan*, 737 F.3d at 849 (vacating grant of summary judgment dismissing retaliation claims where defendants provided shifting explanation for employee's termination). Defendants now contend that they had legitimate reasons for dismissing Chen: "her longstanding inability to work in a collegial manner with other faculty members, and her inappropriate conduct with respect to [the Student]." Appellees' Br. at 17. The district court likewise relied on "ample evidence that Chen's reappointment had been called into question long before she filed" her complaints. *Chen*, 2014 WL 1285595, at *11. Yet, in his letter advising Chen of her dismissal, Paaswell made no reference to collegiality problems. Instead, Paaswell's letter relied only on Chen's handling of the incident. Moreover, the record contains evidence that while some colleagues had complained about a lack of collegiality on the part of Chen, she was improving in this respect and, even after the incident, she received "two colleague evaluations of 'Very Good' and 'Excellent.'" App. at 202. Hence, defendants have providing shifting explanations for Chen's dismissal.

In any employment case, a plaintiff must take "the bits and pieces of available evidence" to create a "mosaic" of facts supporting her claim of discrimination or retaliation. *See Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998), *abrogated in part on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1988). A reasonable jury *could* agree with the district court's assessment of the facts and find Chen's mosaic insufficient to paint a retaliation claim. Taking all the pieces of evidence Chen has presented together, however, and viewing them in the light most favorable to her, a reasonably jury could also conclude that, with her generally positive record, she would not have been fired but-for her complaints about the incident. Accordingly, I would remand Chen's Title VII retaliation claims for resolution by a jury.

## II

I would also remand the case for the district court to properly address Chen's NYCHRL claims. While the district court stated that the standard under New York City law is different from the standard under Title VII, it did not engage in a separate and independent analysis. I thus cannot conclude that the district court properly applied the NYCHRL. *See Velazco v. Columbus Citizens*

*Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (per curiam) (vacating district court's grant of summary judgment dismissing plaintiff's NYCHRL claims for failing to explain "with sufficient clarity" its reasons for dismissing the NYCHRL claims).

Claims under the NYCHRL must be analyzed "more liberally" than Title VII discrimination and retaliation claims. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 592 (S.D.N.Y. 2011). Following the amendments to the NYCHRL in 2005, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims" so "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, a plaintiff need only prove "by a preponderance of the evidence that she has been treated less well than other employees because of her gender [or other protected characteristic]. At the summary judgment stage, judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred." *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009).

54

The district court here dismissed Chen's NYCHRL claims without referencing any of the relevant facts. For Chen's discrimination claims, the district court held: "For the reasons described above [referencing the Title VII discussion], Chen has failed to put forth sufficient evidence to create a genuine issue of fact that discrimination played any role in Defendants' actions." *Chen*, 2014 WL 1285595, at *10. Similarly, for her retaliation claims, the district court held: "Chen's alleged evidence of retaliation is insufficient to raise an issue of fact." *Id.* at *12. The court failed to elaborate on these findings.

In my view, a reasonable jury could find, under the NYCHRL's more lenient standard, that Chen suffered both discrimination and retaliation. Defendants' disagreement with Chen about the nature of the incident and Lesen's subsequent instructions, the temporal correlation between Chen's complaints and termination, Chen's pattern of positive evaluations until the incident, the tainted reappointment process, the disproportionate nature of Chen's punishment, and defendants' shifting explanations surrounding her termination all support her NYCHRL claims, and I would remand for the district court to analyze these claims under the proper standard.

\* \* \*

For the reasons set forth above, I dissent from the majority's disposition with respect to Chen's Title VII retaliation claims and NYCHRL claims, and would instead vacate the judgment of the district court and remand the case for further adjudication.